IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| M2M SOLUTIONS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-033 (RGA) |
| | ) | |
| MOTOROLA SOLUTIONS, INC., TELIT | ) | REDACTED - |
| COMMUNICATIONS PLC and TELIT | ) | PUBLIC VERSION |
| WIRELESS SOLUTIONS INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS TELIT COMMUNICATIONS PLC'S AND TELIT WIRELESS
SOLUTIONS INC.'S OPENING BRIEF IN SUPPORT OF THEIR MOTION TO
EXCLUDE THE TESTIMONY OF M2M'S EXPERTS HERMAN "WHITEY"
<u>BLUESTEIN AND RICHARD BERO, RELATED TO DAMAGES</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

OF COUNSEL:

David Loewenstein
Clyde A. Shuman
Guy Yonay
Keren Livneh
PEARL COHEN ZEDEK LATZER
1500 Broadway, 12th Floor
New York, NY  10036
(646) 878-0800

*Attorneys for Defendants Telit
Communications PLC and Telit Wireless
Solutions, Inc.*

July 10, 2015  - Original Filing Date
July 17, 2015 - Redacted Filing Date

**Table of Contents**

Page

I.    NATURE AND STAGE OF THE PROCEEDING ................................................1

II.   SUMMARY OF ARGUMENT ..............................................................................1

III.  INTRODUCTION ..................................................................................................2

      A.    The Parties ...................................................................................................2

      B.    The Asserted Patent, Technology and Market .............................................2

      C.    Background of the Litigation .......................................................................3

IV.   BLUESTEIN, BERO AND THEIR REPORTS .......................................................4

      A.    The Beecham Reports ..................................................................................5

      B.    The Flawed Bluestein and Bero Reports .....................................................7

      C.    Bluestein's Other Failings ...........................................................................11

      D.    Bero Ignored a Purchase Agreement and Existing Patent Licenses ...........13

V.    ARGUMENT .........................................................................................................14

      A.    Bero's and Bluestein's Reports Are Not
            Reliable and Should Be Excluded ...............................................................14

            1.    The Survey Data is Unreliable and Should Be Excluded ...............16

            2.    Bero's and Bluestein's Failure to Consider
                  Preexisting Agreements and Design Around
                  Costs Make the Opinions Unreliable ..............................................18

            3.    Bero Failed to Apply the *Georgia-Pacific* Factors Correctly .........19

VI.   CONCLUSION ......................................................................................................20

**Table of Authorities**

Page(s)

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ................................................................................. 14, 15, 16, 19

*Fractus, S.A. v. Samsung*,
  2011 U.S. Dist. LEXIS 154697 (E.D. Tex. 2011),................................................................17

*General Electric v. Joiner*,
  522 U.S. 136 (1997) ....................................................................................... 16, 19

*Georgia-Pacific Corp. v. U.S. PlywoodCorp.*,
  318 F.Supp. 1116 (S.D.N.Y. 1970)
  *modified and aff'd* 446 F.2d 295 (2d Cir. 1971) ......................................................3

*In re Paoli R.R. Yard PCB Litigation*,
  35 F.3d 717 (3d Cir. 1994) ........................................................................... 14, 15

*Intellectual Venture I LLC v. Xilinx, Inc.*,
  No. 10-1065-LPS, slip op. (D. Del. Apr. 17, 2014) ................................................18

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*,
  2007 U.S. Dist. LEXIS 57320 (S.D.N.Y. 2007) ...................................................16

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ..................................................................................... 14, 15, 16

*Laser Dynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012).......................................................................... 15, 16, 17

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...................................................................16

*Lucent Technologies, Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009).............................................................................17

*MicroStrategy, Inc. v. Business Objects, S.A.*,
  429 F.3d 1344 (Fed. Cir. 2005)...............................................................................3

*ResQNet.com, Inc. v. Lansa*,
  594 F.3d 860 (Fed. Cir. 2010)...............................................................................17

*Riles v. Shell Exploration and Production Co.*,
  298 F.3d 1302 (Fed. Cir. 2002).............................................................................18

*Robocast, Inc. v. Microsoft Corp.*,
  2014 U.S. Dist. LEXIS 10745 (D. Del. 2014) ......................................................13

*Taser Int'l, Inc. v. Karbon Arms, LLC*,
  6 F. Supp.3d 510 (D. Del. 2013).................................................................... 13, 16

*United States v. Downing*,
  753 F.2d 1224 (CA3 1985) ...............................................................................14

*VirnetX, Inc. v. Cisco Sys.*,
  767 F.3d 1308 (Fed. Cir. 2014)........................................................................15

*XpertUniverse, Inc. v. Cisco Sys.*,
  2013 U.S. Dist. LEXIS 32932 (D. Del 2013). .............................................. 13, 19

**Rules**

Fed. R. Evid. 702 ..............................................................................................14

**Treatises**

32-11 P *Moore's Federal Practice - Civil* § 11.493 (2014). .....................................16

I.    NATURE AND STAGE OF THE PROCEEDING

In January 2012, M2M Solutions LLC ("M2M") sued Telit Communications PLC ("Telit PLC") and Telit Wireless Solutions, Inc. ("Telit US") (collectively, "Telit") and Motorola Solutions, Inc. ("Motorola") for infringement of two patents.  The Court held a *Markman* hearing, invalidated one patent, and interpreted certain claim terms in the other patent, including "permitted caller" to mean *inbound* callers from whom the device accepts calls, and "coded number".  (D.I. 94).  All discovery is closed and the parties are in the dispositive and *Daubert* motion stage.  The claims against Motorola have been dropped and the case against it stayed. (D.I. 158).

II.   SUMMARY OF ARGUMENT

M2M offered opinions of two damages experts, Richard Bero, an accountant, and Herman ("Whitey") Bluestein, a self-described "thought-leader" and purported expert in "market dynamics, market structure, and market demand for various M2M features."  (Ex. A at 2-3).[1] Together, they based a reasonable royalty estimate on two small, unreliable, online surveys conducted by a British market research firm for an unrelated, nascent *services* market (which analyzed services that were predicted to grow in the future) (the "Beecham Reports," Exs. B (2010) and C (2011)).  Nevertheless, Bero and Bluestein purport to derive from these surveys a value of the "patented technology" based on responses related to "security" in general and whether the respondents use "internal resources" to manage their machine-to-machine modules. (Ex. A at 21-22, Ex. F at 5-6 and 12-13).  Telit was not a participant in the surveys and there is no evidence that any Telit customer was either.  (Ex. D, Tr. 75 and 78-79; Ex. E, Tr. 191-92).

---

[1]    "Ex. ___" refers to an exhibit of the Declaration of Keren Livneh, submitted with this brief.

1

In addition, neither Bero nor Bluestein has the experience to qualify them as experts in this matter:  neither has negotiated a single patent license (Ex. D, Tr. 217; Ex. E, Tr. 124); neither has any relevant experience (see, e.g., Ex. F, Attachment 2; Ex. E, Tr. 23-24, 26-28 and 33-38), and neither has a basis to determine what value customers place on the claimed subject matter (in part because neither understands what it is), or what a manufacturer would be willing to pay for a license to the asserted patent.

Unsupportable assumptions, based on conjecture and nothing more than Bluestein's *ipse dixit*, infect these "expert" opinions.  Their opinions do not follow any recognizable methodology, and certainly not a peer reviewed methodology.  They follow no generally accepted theory, and fail the Federal Circuit's most basic requirement that the royalty amount be closely tied to the claimed subject matter.  (*Infra*, p. 15).  These opinions are not based on sound methodological analysis; they are unreliable and do not satisfy the *Daubert* principles.  Simply put, they do not "fit the facts."

III.    INTRODUCTION

A.    The Parties

Telit is a leading innovator of wireless modules (sometimes called modems), and has been for almost two decades, long before the asserted patent was filed.

M2M was established just a few days before this suit was filed, solely to bring this suit. (Exs. G; Ex. H, Tr. 15 and 31-32).

B.    The Asserted Patent, Technology and Market

U.S. Patent No. 8,094,010 ("the '010 Patent") generally relates to a device that connects a local device, like a vending machine, to a remote "monitoring device."  The claims are limited, however.  In its *Markman* decision, the Court:

2

- held "permitted caller" is an inbound caller from whom the device accepts calls (D.I. 94 at 6-7);

- rejected M2M's attempt to have the "permitted caller" limitation cover *outbound* transmissions (e.g., from a vending machine to a remote device) (D.I. 94 at 6-7); and

- held that "coded number" means a "designated, unique sequence of characters" (D.I. 94 at 8-9).

Furthermore, the "coded number" and a telephone number (or IP address) must be in a single transmission (Ex. I, ¶ 2), and the asserted claims require an additional ill-defined component called a "programmable interface." Thus, the claims are quite narrow.

Following the *Markman* decision, M2M admitted that other defendants, Cinterion, Sierra Wireless and Kowatec, did not have inbound call screening and therefore did not infringe. (Exs. J at 1, K at 2, and L at 3-4). Yet, more than half of the machine-to-machine devices sold worldwide are made by these manufacturers. (Ex. F at 14). Most of Telit's products are not accused of infringement. (Ex. D, Tr. 44-45) This means (among other things) that companies can sell them very successfully without the claimed subject matter. Also, the inclusion of these admittedly non-infringing devices in the surveys makes conclusions drawn from them unreliable.

C.    Background of the Litigation

Telit served an interrogatory on M2M seeking information about M2M's reasonable royalty claim, including what *Georgia-Pacific*[2] factors were applicable. (Ex. M at 17-19). M2M responded that its royalty claim was based on the ███████████████   That response,

---

[2]    *Georgia-Pacific Corp. v. U.S. PlywoodCorp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970) *modified and aff'd* 446 F.2d 295 (2d Cir. 1971).

which did not mention the Beecham Reports, was never updated – itself a sufficient reason to exclude this testimony.[3]

## IV.   BLUESTEIN, BERO, AND THEIR REPORTS

Bluestein has no expertise relevant to his opinions or to the relevant issues.  (Ex. E, Tr. 23-24, 26-28, 33-4 and 109).  His experience is primarily working for wireless network providers (like MCI; Ex. A, Exhibit 1).  He has never:

- published any articles on the subject, other than on his experience driving a "connected car" (Ex. E, Tr. 37-38);

- spoken publically about machine-to-machine modules (Ex. E, Tr. 38);

- negotiated any patent licenses (Ex. E, Tr. 124);  or

- spoken to any Telit customer about permitted caller lists, coded numbers, or whether they use internal resources to program their devices (Ex. E, Tr. 40-42, 87-88 and 275).[4]

His deposition answers supposedly establishing his qualifications, cite:  having a home smart meter; reading his electric bill; driving a car with a navigation system (which he says is an machine-to-machine device); discussions with unnamed PG&E installers; and talking to people in AT&T, Sprint and Best Buy stores.  (Ex. E, Tr. 24-28 and 33-38).

Bero has testified more than 125 times, but has never negotiated a patent license.  (Ex. F at 3; Ex. D, Tr. 217).  He was used more as a conduit to express Bluestein's baseless theories than as an independent licensing expert.  He simply relied on Bluestein's flawed assumptions, and "did the math."  Bero's testimony has been excluded twice in the past two years.  *Sloan*

---

[3]   *MicroStrategy, Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1356 (Fed. Cir. 2005) (excluding damages evidence of a damages theory not set forth in an interrogatory answer).

[4]   He spoke with one company that supposedly used a "Telit device" and had "security capability that's built in."  (Ex. E, Tr. 38 and 41).  He did not know the specifics or whether the patented technology was used.  (Tr. 41-42).

4

*Valve Co. v. Zurn Indus.*, 33 F. Supp. 3d 984, 993-1003 (N.D. Ill. 2014); *Thermal Design, Inc. v. Guardian Bldg. Prods.*, 2013 U.S. Dist. LEXIS 53926 (E.D. Wis. 2013).

Bero admittedly does not understand the "patented technology" and developed a royalty theory that is untethered to the narrow subject matter claimed. (See, e.g., Ex. D, Tr. 25-27, 40, 55-56, 86 and 192). He relied on Bluestein to establish a link to the Beecham Reports. (Ex. D, Tr. 61, 85-6 and 155-59; see also Tr. 26). Under the title "VII. Value of Patented Technology" of Bero's report, he purports to use the Beecham Reports to value the "patented technology." (Ex. F at 10). At his deposition, however, he testified (Ex. D, Tr. 244-45):

> A.    My understanding is I'm valuing the next best alternative to the patented technology.
> Q.    So you're not valuing the patent at issue at all then?
> A.    Not -- that's not exactly what I'm valuing, as I understand it.

Bero simply did not understand what the patent claims cover, or the Beecham Reports.

A.    The Beecham Reports

The Beecham Reports analyze a segment of the industry called "Services Enablement Services" ("SES") (Ex. B at 1), and purport to analyze services that would grow in the future (e.g., customer support, device management, data warehousing, etc.). (Ex. B at 53-55; Ex. E, Tr. 193). There is no evidence either party would have relied on them for licensing negotiations.

Beecham conducted two surveys, one in 2010 and the other in 2011, related to these *services*. (Exs. B and C). According to M2M, however, the '010 Patent covers *devices*, not services.[5] The survey sample size was small (perhaps 1 or 2 U.S. end users; Ex. D, Tr. 66-68). Yet, the Beecham Reports purport to cover a spectrum of worldwide respondents who used

---

[5]    The patent's claims are invalid hybrid claims combining method steps with apparatus limitations, which is addressed in the accompanying Motion for Summary Judgment on Invalidity.

systems that are irrelevant to the claimed subject matter, including *non-infringing* devices and services (Ex. D, Tr. 41 and 156-8):

- *wired* devices (Ex. B at 8; Ex. C at 21) that Bluestein admits are not covered by the patent (Ex. A at 9 ("the claimed invention…relates to a wireless… device…"); Ex. E, Tr. 260-1). Indeed, almost as many respondents used Ethernet as their "[c]onnectivity [t]echnolog[y]" as cellular (Ex. B at 8); and

- foreign *wireless* network carriers (such as T-Mobile Germany and Vodaphone) (Ex. B at 31; Ex. C at 45; and Ex. E, Tr. 186-87).

Other than Bluestein's rhetoric, there is nothing to support the assertion that all persons throughout the worldwide wireless communications eco-system – from end users, wireless network providers to module manufacturers – affix identical values to the concept of "security" (which, of course, is not the claimed technology). Indeed, Bluestein (the supposed marketing expert) admitted that he does not know if they value "security" consistently (Ex. E, Tr. 179), or how manufacturers' worldwide market shares relate to their U.S. market share (Ex. E, Tr. 162-4).

The Beecham Reports' surveys do not pass the rigorous test for admissibility. (*Infra*, pp. 16-17). They do not say how the respondents were selected, only about 10% of the people contacted responded, and some of the conclusions are drawn based on undocumented interviews with the Beecham Reports' author. (See Ex. N, ¶ 48). Telit was not included in either survey, and was not in the SES business when the surveys were conducted. (Ex. D, Tr. 75 and 78-79; Ex. E, Tr. 191-2).

Further, surveys are notoriously inaccurate. (*Infra*, p. 16-18). At a minimum, the questions need to framed correctly, analyzed properly, and the pool of respondents scrutinized to determine if the conclusions are reliable. (*Infra*, pp. 16-17). The best Bluestein can say in response to criticism about the Beecham Reports is that Telit invited the author to speak at an industry event, and published an article he wrote in its magazine. (Ex. O, ¶¶ 4, 7 and 12).

6

Neither Bero nor Bluestein had ever used the Beecham Reports prior to this litigation. (Ex. D, Tr. 58-59; Ex. E, Tr. 156).

B.      The Flawed Bluestein and Bero Reports

Bluestein used the 2011 Beecham Report, which had nothing to do with Telit, to estimate both the existence and extent of Telit's alleged infringement.  The linchpin of Bluestein's theory is that respondents who said they used "internal resources to manage their M2M modules," are using "the patented technology."  (Ex. A at 21-22).

There is no connection between "internal resources" and the '010 Patent other than Bluestein's *ipse dixit.*  (Ex. D, Tr. 159).  In any event, Bluestein made a "rough estimation" that a survey respondent used the "patented technology" if he or she used "internal resources" (i.e., an IT employee) instead of "external resources" (i.e., a paid third-party consultant) "for remote monitoring."  (Ex. A at 21-22; see also Ex. D, Tr. 126-30).  Bluestein somehow concluded that using "internal resources" was a "rough proxy" for using the "patented technology."  (Ex. A at 22).  In other words, M2M's royalty analysis is not based on the claimed technology, but instead on the employment status of an IT worker.  (Ex. D, Tr. 128-9).

Citing nothing, Bluestein carried his speculation a step further, assuming that for respondents who said they used both "some internal and some external resources," half were using the "patented technology."  (Ex. A at 21).  There is no support for that, either.  (Ex. D, Tr. 130-1).  Then, based on the Beecham Reports' number of respondents who were "product manufacturers (not the M2M module manufacturers)" and end users, his "rough estimation would be that about 37.8% of [those] respondents…were using internal resources for SES…." (Ex. A at 22).  That, in turn, is a "rough proxy [that] this study would indicate that at least 37.8% of customers use the patented technology to wirelessly remotely program their M2M products…" (at 22) (even though the survey says nothing about the claimed subject matter).

Moreover:

- Bluestein admitted the "Beecham reports do not specifically identify the patented technology" (Ex. O, ¶ 5), and "the Beecham report does not specifically call out permitted callers lists or coded numbers" (Ex. P, ¶ 25; see also Ex. Q, ¶ 5).

- There is no evidence that the surveys' respondents had devices with any of the following claim elements: a coded number, permitted caller list, or "programmable interface" (Ex. D, Tr. 131-2; Ex. E, Tr. 196-8 and 200-1).

- The Beecham Reports include _non_-infringing products, such as Sierra Wireless's, and wireless service providers, such as Vodafone (see, e.g., Ex. B at 31 and 35; Ex. C at 45; Ex. D, Tr. 41; Ex. E, Tr. 186-7 and 214).

- Neither of M2M's two technical experts' reports mentioned the Beecham Reports. Any supposed connection was left to Bluestein, who has no technical background whatsoever (Ex. A at 9) and does not understand the patent claims (see, e.g., Ex. E, Tr. 78-81, 93-7 and 181-3).

Bluestein's report asserts:

- "The patented technology encompasses out-of-the-box intelligent M2M modules _with security features_…;" and

- "[A] fundamental difference between an intelligent M2M module using the patented technology and an M2M module that is remotely programmable using a dedicated cloud-based platform, is based on _the security features_ enabled by the patented technology."

Ex. A at 20-21 (emphasis added).

Bluestein did not – and could not – tie his conclusions to the _claimed_ subject matter of the '010 Patent, which relates to a very narrow slice of technology – _inbound_ call screening, using a "coded number" (i.e., "a designated, unique sequence of characters;" D.I. 94 at 8-9) in the same transmission as a telephone number (or IP address). (Ex. I, ¶ 2; see also Ex. R, ¶¶ 76-84). Although he is really in no position to assess any technology, he asserts that the "patented technology" broadly relates to "security." (Ex. A at 20-21). The Beecham Reports, however,

8

include *outbound* communications (e.g., from a vending machine).[6]   (Ex. R, ¶¶ 83-84).   The Court's *Markman* decision, however, rejected M2M's assertion that permitted callers were those who received outbound calls.  (D.I. 94 at 6-7).

Bluestein further "understand[s] that the claimed invention" relates generally to a "wireless programmable communicator…" (Ex. A at 9).  But the Beecham Reports included a large number of respondents who used *wired* transmissions.  (Ex. B at 8 and Ex. C at 21).  The alleged value of "security" for *wireless* communications cannot be derived from a survey that included *wired* device users.

Although Bero admitted the Beecham Reports were not intended to be used to calculate a reasonable royalty (Ex. D, Tr. 64-65), he then relied on Bluestein's internal/external assumption as a basis to value the "patented technology" (Ex. D, Tr. 158-9) and/or its "next best alternative" (Tr. 244-5).  His testimony is internally inconsistent on this score.  (See *supra*, p. 5).

Compounding these fundamental methodological flaws, Bero relied on the 2010 Beecham Report's Average Revenue Per User ("ARPU").  ARPU is a recurring monthly revenue estimate used, for example, by wireless carriers or cable TV companies.  (Ex. D, Tr. 242-3).  But Telit's "one-off" sale of a device has no recurring revenue stream.  (See Ex. D, Tr. 244; Ex. E, Tr. 189-90).  ARPU, therefore, is irrelevant.

From the ARPU, Bero and Bluestein derive a value of "security" – supposedly a component of the "patented technology," but a term not used in the patent, and which is far broader than any reasonable interpretation of the patent claims.  (Ex. R, ¶¶ 78-84).  Bluestein's thesis that the "patented technology" covers the extremely broad category of "security" (and

---

[6]   See Ex. B at 5 ("Device Data Security – security of data *from* remote devices"); Ex. C at 71 ("Device data security…covers…data to be transferred *from* a device or sensor…"); emphases added.

"authorisation") in general is unsupported and unsupportable. (Ex. R, ¶¶ 76-84). Indeed, Bluestein admitted the claimed subject matter does not "cover all aspects of these categories." (Ex. Q, ¶ 5; see also Ex. O, ¶ 5; Ex. P, ¶ 25). More importantly, no technical expert ties the Beecham Reports, or internal/external resources assumption, to the patent claims.

Notwithstanding these methodological infirmities, and the lack of technical support, Bero extracted a "value" per module *per month* for "Authorisation/Access Control" and "Device Data Security" (inbound and outbound, wired and wireless) of the total ARPU from the 2010 Beecham Report. (Ex. B. at 43). Bero multiplies that ARPU by the numerical range derived from Bluestein's internal/external resources assumption (Ex. F at 11-13), which Bero then forecasts out for the life of the patent. (Ex. F at 20, Schedule 3.0 and 3.1).

After the mathematical gymnastics, Bero arrived at a "rounded" royalty rate (Ex. D, Tr. 241) for 2012 that amounts to █████████████████████████████████████ ████████████████████████████████████████ (Ex. D, Tr. 44-45), ████████████████████████████████████████ ███████████████████████████████ (Ex. N, ¶¶ 77-83).

These incorrect foundational hypotheses permeate Bero's and Bluestein's reports making them wrong *ab initio*. Moreover, Bluestein admitted "there is no direct tie to the patent per se …" and his "internal resources" supposition. (Ex. E, Tr. 281-2). The Beecham Reports, admittedly, also do not relate in any way to the claimed subject matter of the '010 Patent.

Given his reliance on Bluestein's opinion and the Beecham Reports, Bero admitted, as he had to, that he has no evidence that the subject matter of the patent "drive[s] the demand for the modules" (Ex. D, Tr. 49), the touchstone for any relevant royalties analysis. (*Infra*, p. 15).

10

Bero also ignored:

- ████████████████████████████ (Ex. N, ¶ 117);

- the purchase of Motorola's entire worldwide machine-to-machine business, the price of which of would have served as an upper-most bound at the hypothetical negotiation (Ex. N, ¶ 85); and

- design around costs, relying on Bluestein who admitted he did not understand the design around Telit has implemented (Ex. T at 13; Ex. D., Tr. 35-36; Ex. E, Tr. 146-55; Ex. U, Tr. 456).

C.    Bluestein's Other Failings

Bluestein, with no technical training, also opines that the claimed subject matter provides the following "advantages," none of which is mentioned in the patent specification, file history or the claims:

● Modules are built to operate in "rugged if not brutal conditions" (Ex. A at 10) and "built to last" (at 11). But longevity is not patentable and is irrelevant to any issue in this case. He admits he has no evidence that Telit's accused products are more or less "rugged" than non-infringing modules. (Ex. E, Tr. 222). In any event, there is no basis to double the reasonable royalty if a product lasts twice as long. (Ex. D, Tr. 174-5; Ex. N, ¶ 57).

● Initial component costs are reduced, and customers "build[ ] a longer lasting business stability." (Ex. A at 14). However, there is no evidence, nor could there be, that the claimed subject matter somehow reduces the cost to customers or adds stability to any business.

---

7    Philip Wesby, ████████████████████████████████████████ " (Ex. F at 14), ████████████████████████████████████████ ████████████████████████████████████████. (Ex. S at M2M 0004931-32).

- "[C]ost of integration and validation" is reduced by the "patented technology." (Ex. A at 15). Bluestein cites *nothing* to support his conjecture. He admitted, however, that the accused products must also be programmed, tested and debugged before they are deployed (Ex. E, Tr. 278-80), meaning there is no cost saving.

- Maintenance costs are reduced. (Ex. A at 15-16). But screening incoming calls cannot improve "maintenance" costs compared to the prior art, or to current non-infringing devices, as Bluestein admitted. (Ex. E, Tr. 238-40).

- "Flexibility" is increased, and the product can be smaller. (Ex. A at 17-18). However, "size" is neither mentioned in the patent, nor patentable. Bluestein admitted that there is no evidence that Telit's accused products are smaller than its non-accused products. (Ex. E, Tr. 222).

- Battery consumption is lower and heat dissipation is better. (Ex. A at 18-19). Bluestein admitted, however, that he does not know whether Telit's accused products dissipate heat better, or last longer, than its non-accused products. (Ex. E, Tr. 221-3). Indeed, it is a principle of basic physics that heat dissipation is a function of surface area; that is, it is harder to reject heat from a smaller device. (Ex. I, ¶166).

Bluestein then concludes, after all these unsupported non-issues are totaled, that "the patented technology conservatively saves a company at least 50%." (Ex. A at 19). He cites nothing to support that and does not break down the calculation into subordinate parts. Bluestein even admits that "it is difficult to quantify and attribute a specific cost savings to each advantage" (Ex. A at 19), and that his "estimate" is based on a "top-down approach" supported by unidentified "anecdotal evidence." (Ex. P, ¶ 23).

12

Bluestein's myriad of unsupported opinions would not be helpful to the factfinder. Moreover, none of these supposed "advantages" have anything to do with the '010 Patent. Permitting the jury to hear this hokum is directly contrary to principles set forth in *Daubert*.

D.      Bero Ignored a Purchase Agreement and Existing Patent Licenses

Telit's affiliate purchased Motorola's entire worldwide machine-to-machine business. M2M initially accused Motorola's products (the G24 and G30) of infringement, demonstrating the relevance of that transaction. (Ex. V at 1-2). █████████████████████████████████████████████████████████████████████████████████████████████████████ (Ex. N, ¶ 85) ████████████████████████████████████ (Ex. N, ¶ 87). ████████████████████████████████████████ (Ex. F at 3) for a single, easily avoidable U.S. patent is ████████████████████ That reflects an unrealistic and methodologically unsound result. (Ex. N, ¶¶ 85-91). Bero ignored that agreement, without any analysis whatsoever. (Ex. F at 16) ("[T]hese agreements do not appear to have any relevance to the issues in this matter.")[8]

████████████████████████████████████████████████████████████████████████████████████████████████████████████ (Ex. N, ¶¶ 117-122). Those licenses provide far more value to Telit than a proposed license under the single asserted U.S. patent. But Bero ignored them too, with no analysis. (Ex. F at 16; Ex. D, Tr. 150-152).

---

[8]      An expert opinion, without analysis, is not an expert opinion. *Taser Int'l, Inc. v. Karbon Arms, LLC*, 6 F. Supp.3d 510, 521 (D. Del. 2013) ; *Robocast, Inc. v. Microsoft Corp.*, 2014 U.S. Dist. LEXIS 10745 at *7-*8 (D. Del. 2014); *XpertUniverse, Inc. v. Cisco Sys.*, 2013 U.S. Dist. LEXIS 32932 at *7-*11 (D. Del 2013).

These "real-world" assessments are high water marks, and any reasonable negotiator would have considered them.  (Ex. N, ¶¶ 84-91 and 117-123).

V.       ARGUMENT

   A.       Bero's and Bluestein's Reports Are Not Reliable and Should Be Excluded

The Court's "gatekeeper" function is intended to prevent the jury from being led astray by "junk" science (or here, junk opinions) masquerading as the truth.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999).  Expert testimony, therefore, must be excluded unless it is:

(1)      based on sufficient facts or data;
(2)      the product of reliable principles and methods; and
(3)      the expert reliably applies the principles and methods to the facts of the case.

Fed. R. Evid 702.

The touchstone is whether the proposed testimony would be helpful to the jury.  Fed. R. Evid. 702.  The inverse is also true:

> "'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.' [Citation omitted].  See also *United States v. Downing*, 753 F.2d 1224, 1242 (CA3 1985) ('An additional consideration under Rule 702 – and another aspect of relevancy – is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute')."

*Daubert* at 591.

M2M bears the burden of persuading the Court to allow Bero and Bluestein to testify.  *Daubert* at 592 n. 10; *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 743-44 (3d Cir. 1994).

*Each step* of an expert's opinion must be reliable including, most importantly, the underlying factual support.  *Paoli* at 745 (emphasis in original):

> *[A]ny* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.*

14

As explained above, each link in the chain of Bero's and Bluestein's opinions is flawed. The underlying data are unreliable; the Beecham Reports were never intended to be used in litigation, and do not address the claimed subject matter of the '010 Patent. The application of the data is unreliable: the unsupportable conclusion that anyone using "internal resources" uses the "patented technology," and that half the respondents use the "patented technology" if they use both internal and external resources, are textbook examples of unreliability. There is no correlation between these surveys and the asserted patent claims.

> No matter what form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features.
>
> *       *       *
>
> The law requires patentees to apportion the royalty down to a reasonable estimate of the value of the *claimed* technology or else establish that the patented technology drove demand for the entire product.

*VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1326, 1329 (Fed. Cir. 2014) (emphasis added); *Laser Dynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66-70 (Fed. Cir. 2012) (in a multi-component product, patentee must show the patented feature "drives demand" before it can be awarded a percentage attribute to the entire product).

Any pseudo-expert report that does not carefully tie the damages analysis to the *claimed subject matter* is worthless, and must be excluded. See *VirnetX* at 1329.

"[T]estimony will be excluded if it is not scientific knowledge *for the purposes of the case*." *Paoli* at 743 (emphasis in original). Admittedly, the Beecham Reports were not created to calculate royalties (Ex. D, Tr. 64-65) and the underlying survey responses cannot be twisted to support a conclusion for which they were never intended. Extrapolating that irrelevant information to somehow say that a certain percentage of users employ the "patented technology" and would pay an amount based on an ARPU for an irrelevant service is a "force fit" – at best.

15

*Kumho Tire* set forth several factors, mentioned in *Daubert* that provide guidance on whether the proposed testimony is sufficiently reliable. *Kumho Tire* at 149:

(1)   whether the theory or technique can be (and has been) tested;
(2)   whether the theory or technique has been subjected to peer review and publication;
(3)   a particular technique's known or potential rate of error; and
(4)   the general acceptance of the theory or technique.

*Daubert* at 592-94. Although the Court has flexibility, and these factors are not dispositive, they nevertheless illustrate the failings of Bero's and Bluestein's opinions, which comply with none. The conclusions in Bero's and Bluestein's reports have obviously never been tested, were not peer reviewed, have no known error rate and are based purely on their say-so. Deriving a patent royalty based on the perceived value of "authorisation" or "security," pulled from market research and held together by a response concerning "internal resources," has not been accepted by anyone (other than Bluestein and Bero).

Where the opinion "is connected to the existing data only by the *ipse dixit* of the expert[]," the Court should exclude the testimony. *Kumho* at 157; *General Electric v. Joiner*, 522 U.S. 136, 146 (1997); *Taser* at 521.

### 1.   The Survey Data is Unreliable and Should Be Excluded

Surveys create special problems for the proponent. To be admissible, a survey must be carefully constructed, and the Court should consider the following:

> (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts.[9]

---

[9]   *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 580 (S.D.N.Y. 2007) (citations and quotations omitted); see also *Laser Dynamics* at 80-81; *Kargo*

16

There is no evidence that any of these criteria have been satisfied.

In *Fractus, S.A. v. Samsung*, 2011 U.S. Dist. LEXIS 154697 at *13-14 (E.D. Tex. 2011), the Court excluded the experts' testimony based on survey evidence that was, like the one here, unconnected to the claimed subjected matter (factual citations omitted; first emphasis added):

> [T]he surveys are not tied to the alleged advantageous technical characteristics of the patents-in-suit.  Put another way, the surveys do not measure how consumers value the purported advantages provided by Plaintiff's technology.  Therefore, the surveys do not measure the value of Plaintiff's technology, but merely measure the perceived consumer value of cell phones with any internal antennas.  *Survey evidence pu rportedly demons trating the   value  of inter nal antennas  not tied directly to P  laintiff's technology c  onfuses the is  sues and mu  st be excluded  .* Allowing the jury to hear such evidence not tied to the claimed invention risks 'compensation for infringement that punishes beyond the reach of the statute.' *ResQNet.com, I nc. v . L ansa*, 594 F.3d 860, 869 (Fed. Cir. 2010).   Indeed, admissible expert testimony must 'carefully tie proof of damages to the claimed invention's footprint in the market place.' *Id.; see also Lucent Technologies, Inc. v. Gat eway, I nc.*, 580 F.3d 1301, 1337 (Fed. Cir. 2009) (the court's objective is 'determining the correct (or at least approximately correct) value of the *patented invention*, when it is but one feature among many').

Divining a patent-related reasonable royalty rate from a market survey (even assuming it were flawlessly conducted and had the correct pool of respondents, etc.) is not a "generally accepted methodology."  In *Laser Dynamics*, the Federal Circuit barred the expert's testimony which, like Bero's and Bluestein's, relied on surveys unconnected to the patent claims, and ignored relevant patent licenses (at 80, citations omitted):

> The 1997 licensing survey was even further removed from the patented technology, since it was not even limited to any particular industry, but "was across whatever technologies were being licensed by the people who responded." … [T]his licensing evidence relied upon by Mr. Murtha "simply has no place in this case."   Relying on this irrelevant evidence to the exclusion of the many

---

*Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 U.S. Dist. LEXIS 57320 at *20 (S.D.N.Y. 2007) (the court identified "[t]wo major defects" that it found "strip the [s]urvey of probative value":  (1) use of a format that failed to approximate real world conditions and was impermissibly leading, and (2) use of improper stimuli); 32-11 P *Moore's Federal Practice - Civil* § 11.493 (2014).

licenses expressly for the '981 Patent served no purpose other than to "to increase the reasonable royalty rate above rates more clearly linked to the economic demand for the claimed technology."

The Court further held that "the Licensing Executives Survey Mr. Murtha relied upon – which has no meaningful ties to the patented technology…" yielded a result that was "arbitrary and speculative." *Id.* at 81.

Bero's and Bluestein's opinions are based on irrelevant, unreliable underpinnings, from which speculative and unsupportable conclusions are drawn. They cannot help the jury reach an informed decision.

> 2.   Bero's and Bluestein's Failure to Consider
>       Preexisting Agreements and Design Around
>       Costs Make the Opinions Unreliable

The pre-existing agreements mentioned above are probative of what Telit (and its counterparties) historically considered reasonable, and what Telit would have considered a reasonable royalty. (Ex. N, ¶¶ 84-91 and 117-23). Bero's and Bluestein's failure to consider them, and failure to consider design around costs (██████████████████████████████ ████████████████████████████ (Ex. N, ¶¶ 44-46) – is a fundamental analytic error that makes the ultimate conclusion worthless. *Riles v. Shell Exploration and Production Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002) ("the market could not award Riles a royalty for his method divorced of all relation to a potential non-infringing alternative method." Further holding that the failure to consider a preexisting license was an error).[10]

---

[10]   Cf. *Intellectual Venture I LLC v. Xilinx, Inc.*, No. 10-1065-LPS, slip op. at 7 (D. Del. Apr. 17, 2014) (excluding expert testimony for failure to consider a license offer).

18

3.    Bero Failed to Apply the *Georgia-Pacific* Factors Correctly

Bero purports to consider the "income approach" (i.e., an evaluation of an accused infringer's profits attributable to the claimed subject matter).  (Ex. F at 19-20 and 24-25). However, he ignored Telit's historic (and expected) profits, ███████████████████████ ███████████████████████████████████████  (Ex. F at 25; Ex. D, Tr. 108). ███████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████  (Ex. D, Tr. 44-45) ████████████

████████████████████████    ████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████. (Ex. N, ¶¶ 77-83).

Under Bero's and Bluestein's hypotheses, Telit would have lost millions of dollars simply to pay M2M royalties, even though it could have, and did, design around the allegedly infringing subject matter.  (Ex. U, Tr. 456; Ex. N, ¶ 83).  No company would agree to stay in business, year after year, to lose money.  Cf. *Xpertuniverse* at *10  (a disproportionate royalty of $32 million on $937,000 in revenue "simply makes no sense.").  Although at the *Daubert* stage, the Court focuses on the expert's methodology rather than his conclusion, they "are not entirely distinct from one another" and where it is "simply too great an analytical gap between the data and the opinion offered," that testimony must be excluded.  *General Electric* at 146.  A royalty rate representing █████████████████████████████████████  demonstrates that analytic chasm.

19

VI.     <u>CONCLUSION</u>

For the foregoing reasons, Bluestein's and Bero's proposed testimony should be excluded.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

OF COUNSEL:

David Loewenstein
Clyde A. Shuman
Guy Yonay
Keren Livneh
PEARL COHEN ZEDEK LATZER
1500 Broadway, 12th Floor
New York, NY  10036
(646) 878-0800

*Attorneys for Defendants Telit Communications PLC and Telit Wireless Solutions, Inc.*

July 10, 2015 - Original Filing Date
July 17, 2015 - Redacted Filing Date

20