IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| M2M SOLUTIONS LLC, | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | Civil Action No. 12-33-RGA |
| MOTOROLA SOLUTIONS, INC., TELIT | : | |
| COMMUNICATIONS PLC, and TELIT | : | |
| WIRELESS SOLUTIONS INC., | : | |
| Defendants. | : | |

MEMORANDUM OPINION

Richard D. Kirk, Esq., Stephen B. Brauerman, Esq., Vanessa R. Tiradentes, Esq., Sara E. Bussiere, Esq., BAYARD, P.A., Wilmington, DE; Marc N. Henschke, Esq. (argued), Jeffrey N. Costakos, Esq., Jason J. Keener, Esq. (argued), Jeffrey J. Mikrut, Esq., Kadie Jelenchik, Esq., Matthew J. Shin, Esq., FOLEY & LARDNER LLP, Boston, MA.

Attorneys for Plaintiff M2M Solutions LLC.

Jack B. Blumenfeld, Esq., Rodger D. Smith II, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; David Loewenstein, Esq. (argued), Clyde A. Shuman, Esq., Guy Yonay, Esq. (argued), Keren Livneh, Esq. (argued), PEARL COHEN ZEDEK LATZER, New York, NY.

Attorneys for Defendants Telit Communications PLC and Telit Wireless Solutions Inc.

January 6, 2016

ANDREWS, U.S. DISTRICT JUDGE:

Before the Court are various Motions for Summary Judgment filed by Defendants Telit

Communications PLC ("PLC") and Telit Wireless Solutions Inc. ("Telit U.S.") (collectively,

"Defendants"). Defendants bring three separate motions, all of which the Court will consider

here: Motion for Summary Judgment Related to Damages (D.I. 165), Motion for Summary

Judgment of Invalidity (D.I. 171), and Motion for Summary Judgment of Non-Infringement (D.I.

175). The motions are fully briefed. (D.I. 166, 172, 177, 196, 198, 202, 226, 228, 230). The

Court heard oral argument on October 30, 2015. (D.I. 245). For the reasons that follow, the

Court will deny Defendants' Motion for Summary Judgment of Invalidity (D.I. 171) and Motion

for Summary Judgment of Non-Infringement (D.I. 175) in their entirety, but will grant

Defendants' Motion for Summary Judgment Related to Damages (D.I. 165) in its entirety.

## I.       BACKGROUND

On January 13, 2012, Plaintiff M2M Solutions LLC ("Plaintiff") filed five patent

infringement actions asserting infringement of U.S. Patent Nos. 8,094,010 ("'010 patent") and

7,583,197 ("'197 patent"). (D.I. 1). The Court held a *Markman* hearing, after which it

invalidated the '197 patent and construed several claim terms in the '010 patent. (D.I. 94). In

this action, the Court granted a stipulation as to Defendant Motorola Solutions, Inc., for entry of

final judgment of invalidity and non-infringement of the '197 patent, which reserved Plaintiff's

right to appeal. (D.I. 158). Accordingly, the present motions relate solely to Plaintiff's

remaining claims against the Telit Defendants for infringement of the '010 patent.

The '010 patent, broadly speaking, relates to mobile communications technology. ('010

patent, col. 2, ll. 56–57). It discloses "a programmable wireless communications apparatus" that

"serves to address [] diverse communication requirements" and allows for "remote data

2

monitoring." (*Id.* col. 1, ll. 22–23; *id.* col. 7, ll. 24–30). Plaintiff asserts that Defendants

indirectly infringe numerous dependent claims of the '010 patent.[1]  Plaintiff dropped its direct

infringement contentions and now only asserts contributory infringement and induced

infringement. (D.I. 198 at 7–8).  The asserted apparatus claims all depend from either unasserted

independent Claim 1 or Claim 52.  Defendants' non-infringement contentions revolve

exclusively around these two independent claims.  Claim 1 of the '010 patent reads as follows:

> 1.  A programmable communicator device comprising:
>
> a wireless communications circuit for communicating through an antenna over a
> communications network;
>
> an identity module for storing a unique identifier that is unique to the
> programmable communicator device;
>
> a processing module for authenticating an at least one transmission sent from a
> programming transmitter and received by the programmable communicator
> device, the at least one transmission including a coded number and at least one
> telephone number or Internet Protocol (IP) address corresponding to an at least
> one monitoring device, wherein the processing module authenticates the at least
> one transmission by determining if the at least one transmission contains the
> coded number, the processing module authenticating the at least one transmission
> if the transmission includes the coded number;
>
> a memory module for storing the at least one telephone number or IP address
> from the authenticated transmission as one of one or more permitted callers if the
> processing module authenticates the at least one transmission by determining that
> the at least one transmission includes the coded number; and
>
> wherein the at least one transmission from a programming transmitter comprises a
> Short Message Service (SMS) data message, or a General Packet Radio Service
> (GPRS) or other packet switched data message.

('010 patent, claim 1).

I construed the term "wireless communications circuit for communicating through an

antenna" to require the inclusion of an antenna. (D.I. 94 at 15).  Plaintiff, and its expert on

---

[1] Specifically, Plaintiff asserts infringement of Claims 2, 5, 19, 26, 42, 54, 57–58, 62–64, 66–67, 70–71, 78–79, 81, 94, and 97. (D.I. 199-1 ¶¶ 1, 34).

infringement, Dr. Ray W. Nettleton, opine that, as sold out-of-the-box, Defendants' accused

modules literally meet and embody all but one of the recited claim limitations. (D.I. 198 at 7–8;

D.I. 199-1 at 11–12, ¶ 29). They allege that the accused products contain pads or connectors

specifically designed for connecting to an antenna. (D.I. 198 at 8; D.I. 199-1 at 15, ¶ 41).

Plaintiff thus argues that in order to use the accused products at all, customers will have to

connect them to an antenna, something which Defendants instruct customers to do. (D.I. 198 at

8). Accordingly, the crux of Plaintiff's infringement contentions is that "[o]nce the customers

connect an accused product to an antenna, it then literally meets and embodies every limitation

of M2M's asserted apparatus claims, and consequently any use of that product by the customer

would constitute an act of direct infringement." *(Id.* (citing D.I. 199-1 at 11–12, ¶ 29)).

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.

R. CIV. P. 56(a).  The moving party has the initial burden of proving the absence of a genuinely

disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317,

330 (1986).  Material facts are those "that could affect the outcome" of the proceeding, and "a

dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury

to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir.

2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The burden on the

moving party may be discharged by pointing out to the district court that there is an absence of

evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue

for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986);

*Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## III.   DISCUSSION

### A.   Motion for Summary Judgment of Non-Infringement (D.I. 175)

Defendants' non-infringement arguments can be broken down into several overarching categories. First, Defendants argue that the '010 patent does not claim functional capability but instead covers structures and method steps, and that Plaintiff failed to prove that anyone directly infringed by not showing that the product inherently contains these structures or that any of these method steps actually occurred. (D.I. 177 at 17–19). Second, Defendants argue that even if the '010 patent claims cover capability, there is no infringement because users must modify the device to enable the alleged capability. (*Id.* at 19). Third, Defendants make three specific

5

arguments asserting that, even after the devices are so modified, certain technical aspects of the accused products do not meet the claim limitations of the '010 patent. (*Id.* at 19–21). Fourth, Defendants make several arguments relating to the standards for indirect infringement. (*Id.* at 21–25).

At the outset, some background on Plaintiff's specific infringement contentions is useful. Plaintiff asserts that only two specific features of the accused products allow the products to operate using infringing functionality: performing coded number authentication on 1) "incoming 'digest ATRUN SMS' message transmissions," and 2) "incoming TCP/IP transmissions received in server mode subject to default automatic authentication."[2] (D.I. 198 at 11–12 (citing D.I. 199-1 at 20–24, ¶¶ 55–63)). More specifically, according to Plaintiff and its expert, the accused products are capable of acting as the claimed "processing module" because they can perform coded number authentication—as required by the processing module limitation—on both of the above types of incoming transmissions. (*Id.*). Plaintiff's position is that both of these features can be enabled via AT Commands. (*Id.* (citing D.I. 199-1 at 20, ¶¶ 55–56)).

Defendants characterize these functionalities as modes: "SMS Digest Mode" and "TCP server mode using . . . automatic authentication." (D.I. 177 at 10).[3] Defendants argue that the accused products need first to be programmed via AT Commands in order to operate in either of these two accused modes. (*Id.* at 10–11). Defendants argue also that the accused products, as sold, cannot execute wireless AT Commands to operate in the accused modes, but must first be programmed by commands sent over a wired connection. (D.I. 177 at 10). Defendants' characterization is relevant to their arguments in two ways. First, Defendants argue that there is

---

[2] Defendants point out that its accused products can operate in modes that Plaintiff does not suggest are infringing: SMS simple mode and TCP server mode using step-by-step authentication. (D.I. 177 at 11).
[3] For the sake of clarity, I will refer to SMS digest authentication and TCP server automatic authentication as the "two accused modes" throughout the remainder of this opinion.

no infringement because Plaintiff presents no evidence that any of Defendants' customers ever programmed the accused products to operate in either of the two accused modes. (*Id.* at 11). Second, Defendants argue that even if the '010 patent does properly claim capability, the devices as sold still do not contain the infringing capability because they need to be modified by users in order to infringe. (*Id.* at 19).

### 1. Whether the '010 Patent Claims Capability

"A patent applicant is free to recite features of an apparatus either structurally or functionally." *In re Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997). The Federal Circuit has generally held that use of the word "for" within apparatus claims provides functional limitations that "describe capabilities without requiring that any software components be 'active' or 'enabled.'" *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204–05 (Fed. Cir. 2010); *see also Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002) ("Claim 1 also sets forth a number of functionally defined means that the software must contain, including a 'means for scoring . . . bonus points' for unusual scoring plays." (alteration in original)). In *Finjan*, the Federal Circuit reasoned that the repeated use of the word "for" in the claim limitations of a system patent covered functional capability and did not "require that the program code be 'active,' only that it be written 'for causing' a server . . . or a computer . . . to perform certain steps." *Finjan*, 626 F.3d at 1204–05. Likewise, the Federal Circuit has also found that use of the word "programmable" is an indication that the patentee is claiming an apparatus in terms of its functionality. *See Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991) ("Because the language of claim 1 refers to '*programmable* selection means' and states 'whereby *when* said alternate addressing mode is selected,' the accused device, to be infringing, need only be capable of operating in the page mode.").

On numerous occasions, the Federal Circuit has looked at functional language in an apparatus claim and concluded that the claim only requires that an accused apparatus possess the capability of performing the recited function. *See, e.g., Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1369–70 (Fed. Cir. 2009) ("[C]laim 22 here only requires a capacity to perform a function . . . ."); *Microprocessor Enhancement Corp. v. Texas Instrum. Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) ("Claim 7 . . . is clearly limited to a pipelined processor possessing the recited structure and *capable* of performing the recited functions . . . ." (emphasis in original)); *Intel*, 946 F.2d at 832. Accordingly, when accused products contain multiple operating modes, "to infringe a claim that recites capability and not actual operation, an accused device 'need only be capable of operating' in the described mode." *Finjan*, 626 F.3d at 1204 (quoting *Intel*, 946 F.2d at 832). "Thus, depending on the claims, an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation." *Id.* (internal quotation marks omitted); *see also Intel*, 946 F.2d at 832.

The Federal Circuit has cautioned, however, that the above "line of cases is relevant only to claim language that specifies that the claim is drawn to capability." *Ball Aerosol and Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 994 (Fed. Cir. 2009). Accordingly, "[u]nless the claim language only requires the capacity to perform a particular claim element . . . it is not enough to simply show that product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010). In all of these cases considering whether claim limitations are drawn to capability, the Federal Circuit has repeatedly emphasized that "the language of the claims, as well as the nature of the accused product, dictates whether an infringement has

8

occurred." *Fantasy Sports*, 287 F.3d at 1118.  For instance, in *Ball Aerosol*, the court found that "[t]he claim language clearly specifies a particular *configuration*," rather than mere functional capability. *Ball Aersosol*, 555 F.3d at 994 (emphasis added).  Likewise, in *Fujitsu*, the court rejected the argument that the claims at issue only required capability when it concluded that the claims at issue were method claims. *See Fujitsu*, 620 F.3d at 1326.  Thus, it appears that courts must make a threshold inquiry into the disputed claim language and decide whether the claims are directed to functional capability or instead require that certain method steps be taken or structural configurations be present.

Here, an important threshold issue to most of Defendants' specific non-infringement contentions is whether the '010 patent properly claims capability or requires actual method steps to be taken.  Defendants argue that the claims of the '010 patent are not directed to capability, but instead cover structures and method steps which need to be performed or activated by customers. (D.I. 177 at 17).  Defendants argue that, in the processing module limitation of claim 1, the inclusion of the words "sent from" and "received by" demonstrates that the claims cover actual events that need to be performed "and therefore, fall outside the *Intel* line of 'capability' cases." (*Id.* at 17; D.I. 230 at 8–9).  Defendants essentially argue that the addition of these verbs during prosecution demonstrates that these steps—sending, receiving, etc.—must physically occur before the claim limitations are met. (D.I. 177 at 17; D.I. 230 at 7–8).  Moreover, Defendants rely on *Fujitsu* and *Ball Aerosol* as cases they contend involved similar claim language that courts found did not properly claim capability. (D.I. 177 at 18).  Defendants therefore argue that because the claims here are not directed to capability, three steps must be taken by a user before there is any direct infringement of the method limitations: 1) the user must program the module "to receive and execute AT RUN commands in one of the two accused

modes, (2) the whitelist or firewall must be programmed and populated, and (3) a user must send a single transmission including the coded number and the contact number." (*Id.* at 19). Thus, according to Defendants, because there is no proof that any of these three steps have been taken, there is no proof that anyone has directly infringed.

Plaintiff responds by arguing that the claims of the '010 patent are apparatus claims with functional limitations, rendering the proper legal standard to be that "an accused device that possesses the requisite functional capability infringes regardless of whether that capability is activated or utilized in any way." (D.I. 198 at 22 (internal quotation marks and alterations omitted)). Plaintiff cites a plethora of Federal Circuit cases—including *Finjan*, *Fantasy Sports*, and *Intel*—supporting the proposition that where an apparatus claim is stated with functional limitations, it is sufficient for purposes of infringement to show that the accused product contains structure rendering it reasonably capable of performing the recited function. (*Id.* at 17–20). Plaintiff distinguishes the cases relied upon by Defendants on the grounds that these cases—*Fujitsu* and *Ball Aerosol*—did not involve apparatus claims with functional limitations, but rather a method claim and an apparatus claim without any functional limitations, respectively. (*Id.* at 23). Accordingly, Plaintiff contends that, under the proper standard, Defendants' argument that there is no evidence that its customers actually ever enabled and used the allegedly infringing modes of operation is legally irrelevant. (*Id.* at 22).

Here, the '010 patent unquestionably covers an apparatus. (*See, e.g.*, '010 patent, col. 1, ll. 22–23 ("The invention relates to a programmable wireless communications *apparatus*." (emphasis added)); *id.* claim 1 (claiming a "programmable communicator *device*" (emphasis added))). Each claim limitation in the two relevant independent claims, much like in *Finjan*, is described in terms of each component of the device's function, using the word "for." (*See id.*

10

col. 12, l. 21 ("a wireless communications circuit for communicating . . . ."); *id.* ll. 23–24 ("an identity module for storing a unique identifier . . . ."); *id.* ll. 25–26 ("a programmable interface for establishing a communication link . . . ."); *id.* l. 27 ("a processing module for authenticating . . ."); *id.* l. 38 ("a memory module for storing . . . .")); *see also Finjan*, 626 F.3d at 1204–05. The use of adjectives such as "processing," "memory," "programmable," "identity," and "communications," also suggests that each component of the device is defined in terms of its function. *See Intel*, 946 F.2d at 832 (suggesting that word "programmable" indicates patentee is claiming apparatus in terms of its functionality).

Defendants, however, seize on the language immediately following the "processing module" claim limitation as purportedly requiring "actual events (i.e., sending, receiving, and authenticating," thereby transforming the entire claim such that, rather than covering an apparatus, it now covers "structures and method steps" that must be performed by customers. (D.I. 177 at 17). The principal claim language Defendants rely on comes from claim 1:

> a processing module for authenticating an at least one transmission sent from a programming transmitter and received by the programmable communicator device . . . .

Defendants essentially suggest that the Court look at the words "sent" and "received" in isolation and regard this passage as requiring that some third-party user perform all of those steps before there can be direct infringement. (D.I. 177 at 17; D.I. 230 at 7–8). The linguistic gymnastics that Defendants engage in to make this argument are hardly convincing.[4] *See R.A.C.C. Indus., Inc. v. Stun-Tech, Inc.*, 1998 WL 834329, at *3 (Fed. Cir. 1998) ("This court has never determined that functional language in a claim converts an apparatus claim into a method of use or hybrid claim."). Indeed, the logic Defendants employ in their efforts to avoid the application

---

[4] I find Defendants' arguments based on the prosecution history, which suggest that amendments that added certain verbs necessarily show that an action must take place, to be similarly unconvincing.

of *Intel* and its progeny is belied by the very claim language at issue in *Intel*. There, the claim

language stated "whereby when said alternate addressing mode is selected said p words in said

memory may be selected with less than n address signals." *Intel*, 946 F.2d at 831.  Under

Defendants' line of argument here, such language, while appearing to claim capability, envisions

that a user actually selects said alternate addressing mode, making it a method step. (D.I. 177 at

18).  The Court in *Intel*, however, expressly considered both similar claim language and

arguments, and concluded that "the accused device, to be infringing, need only be capable of

operating in the [accused] mode.  Contrary to [Respondent's] argument, actual page mode

operation in the accused device is not required." *Intel*, 946 F.2d at 832.

    The language Defendants point to in the "processing module" and "memory module"

claim limitations unambiguously does not discuss the performance of method steps.  With regard

to the "processing module" claim limitation, "the claim recites a function, [and] the immediately

following words provide algorithmic structure for performing that function." (D.I. 237 at 9).

The Federal Circuit has stated that "[s]tructure may [] be provided by describing the claim

limitation's operation . . . . [which] is more than just its function; it is how the function is

achieved in the context of the invention." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1299

(Fed. Cir. 2014).  As I previously noted, it was particularly important that Plaintiff included

considerable description of how the claim's stated functions are achieved in order for "'the

presumption against means-plus-function claiming [to] remain[] intact.'" (D.I. 237 at 7 (quoting

*Apple*, 757 F.3d at 1299)).  I conclude that the additional language following the processing

module claim limitation does not require that method steps be performed.  It simply provides a

description of how the claimed function is achieved in the context of the invention. *See Apple*,

757 F.3d at 1299.  The language of the "memory module" claim limitation similarly provides

additional structure to describe the operation of the stated "storing" function. ('010 patent, col. 12, ll. 38–43). Because I conclude that the '010 patent contains apparatus claims with functional limitations, Defendants' reliance on *Fijitsu* and *Ball Aerosol*, where the courts made initial determinations that the language at issue claimed method steps and an apparatus claim without any functional limitations, respectively, is unpersuasive. *See Fujitsu*, 620 F.3d at 1326; *Ball Aersosol*, 555 F.3d at 994.

The Federal Circuit cases that allowed infringement to be based upon a showing that an accused product was reasonably capable of performing the recited function did not contain any express requirement that the words "capability" or "capable" actually be used in the claims. For instance, Defendants rely on *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (Fed. Cir. 1996), for the proposition that *Intel* does not apply unless the claim only required capability "by its literal terms." (D.I. 177 at 16–17). The claim language in *Intel*, however, did not use the word "capable" or otherwise expressly refer to "capability," which the *Zygo* court itself noted.[5] *Zygo*, 79 F.3d at 1570. The court in *Zygo* therefore acknowledged that the language "PROGRAMMABLE selections means" in *Intel* is what led it to conclude that the claims required capability, rather than any use of the word capability. *Id.* at 1570 (emphasis in original) (quoting *Intel*, 946 F.2d at 832). In addition to *Intel*, numerous other Federal Circuit cases have found that claims were directed toward functional capability without the words "capability" or "capable" being expressly included in the claims. *See, e.g., Finjan*, 626 F.3d at 1204–05 (finding "claims describe capabilities" even though the words "capable" or "capability" did not appear in claim language); *Microprocessor Enhancement Corp. v. Texas Instrum. Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (same).

---

[5] The claim language is set forth in full at *Intel*, 946 F.2d at 831.

Accordingly, I conclude that the claims at issue here only require capability of performing the recited function. In order to prove that the accused modules infringe the asserted claims of the '010 patent, therefore, the accused devices need only be capable of operating in the allegedly infringing modes. *See Finjan*, 626 F.3d at 1204. Thus, because I reject Defendants' argument that the '010 patent does not properly claim capability, they are not entitled to summary judgment on the ground that Plaintiff failed to prove that any third-party performed certain method steps.

## 2.  Whether the Accused Functionality Exists in the Products As Sold

The Federal Circuit has also made clear that, even where apparatus claims use functional language and only require the accused products to have the capability of exercising the accused function, "the apparatus as provided must be 'capable' of performing the recited function, not that it might later be modified to perform that function." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1380 (Fed. Cir. 2011). In fact, in *Fantasy Sports*, the Federal Circuit rejected the proposition that *Intel* and its progeny allow infringement to "be based upon a finding that an accused product is merely capable of being modified in a manner that infringes the claims of a patent." *Fantasy Sports*, 287 F.3d at 1117–18; *see also Telemac Cellular Corp. v. Topp Telecomm., Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001) ("[T]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement."). Accordingly, the infringement analysis of claims that require capability differs in a "situation in which an apparatus does not perform the function stated in the claim unless the apparatus is specifically so programmed or configured." *Typhoon Touch*, 659 F.3d at 1380.

14

*Fantasy Sports* similarly involved claims that were defined in terms of their function. *See Fantasy Sports*, 287 F.3d at 1118. The Federal Circuit analyzed whether the accused products were inherently capable of the infringing function as follows:

> Software is a set of instructions, known as code, that directs a computer to perform specified functions or operations. Thus, the software underlying a computer program that presents a user with the ability to select among a number of different options must be written in such a way as to enable the computer to carry out the functions defined by those options when they are selected by the user. Therefore, although a user must activate the functions programmed into a piece of software by selecting those options, the user is only activating means that are *already present in the underlying software*. Otherwise, the user would be required to alter the code to enable the computer to carry out those functions. Accordingly, in order to infringe the '603 patent, the code underlying an accused fantasy football game must be written in such a way as to enable a user of that software to utilize the function of awarding bonus points for unusual plays such as out-of-position scoring, without having to modify that code. In other words, an infringing software must include the "means for scoring . . . bonus points" regardless whether that means is activated or utilized in any way.

*Id.* The critical inquiry was whether the accused functionality was already contained in the underlying software such that it only had to be "activated," or whether the user needed to alter the code to enable the computer to use the accused functionality. *See id.*

The Federal Circuit clarified this standard further in *Finjan*, in the context of "system claims [that] recite software components with specific purposes" and therefore "describe[d] capabilities without requiring that any software components be 'active' or 'enabled.'" *Finjan*, 626 F.3d at 1204–05. There, the Federal Circuit noted that "it is undisputed that software for performing the claimed functions existed in the products when sold—in the same way that an automobile engine for propulsion exists in a car even when the car is turned off." *Id.* at 1205. The court in *Finjan* again emphasized that the critical inquiry is whether the accused functionality is "already present" in the accused products when sold, or needs to be added—versus activated—by the user. *See id.* The court ultimately concluded that:

There is no evidence that customers needed to modify the underlying code to unlock any software modules. The fact that users needed to "activate the functions programmed" by purchasing keys does not detract from or somehow nullify the existence of the claimed structure in the accused software. Therefore, the jury's infringement verdict on the system and media claims was based on a legally sufficient evidentiary basis . . . .

*Id.*

Accordingly, the critical inquiry here is whether the accused modules are capable of operating in the two accused modes—SMS digest mode and TCP server mode using automatic authentication—based on what is already present in their underlying firmware. If users must modify or otherwise alter the modules to perform the accused functionality, Plaintiff cannot prove infringement. This distinction between modifying the device's functionality and merely activating functionality that the device already contains is what separates the parties.

Defendants argue that even if the '010 patent does properly claim capability, the devices as sold do not infringe because they need to be modified in order to provide the claimed functionality. (D.I. 177 at 19). They argue that the devices as sold do not operate in either of the two accused modes of operation. Instead, they argue, the user must actively modify the devices to operate that way using AT Commands, providing them with new functionality they did not previously have. (*Id.*). The only part of the record Defendants cite for the assertion that the modules need to be modified before they can operate in the infringing modes is the deposition testimony of Plaintiff's expert, Dr. Ray Nettleton. (D.I. 178-3 at 41, 63, 70). Accordingly, Defendants rely on *Typhoon Touch* for the proposition that merely having the capability of being programmed or configured to operate in the infringing mode is not sufficient to find infringement if the product needs to subsequently be altered by the user in order to infringe. (D.I. 177 at 19). Defendants thus assert that because there is no evidence that any of their customers have ever

16

"programmed" these features, there is no proof that anyone directly infringed the '010 patent. (*Id.* at 7).

Plaintiff responds by reiterating that the proper legal issue to consider is whether Defendants' accused products "include structures that possess the capability of performing the recited functions." (D.I. 198 at 21). Plaintiff further contends that "because M2M is principally reading these claim elements on *firmware* contained in the accused products, the relevant standard is whether the accused firmware contains software program code that renders it 'reasonably capable' of performing the recited functions without the need for having to 'modify the underlying code.'" (*Id.* (quoting *Finjan*, 625 F.3d at 1204–05)). Accordingly, Plaintiff continues, "[w]here no modification to the software program code is required, as a matter of law the recited functional capabilities will be deemed 'already present in the underlying software' such that an accused device will be found to meet the claimed functional limitations." (*Id.* (quoting *Finjan*, 625 F.3d at 1204–05)). Under this proper standard, Plaintiff contends that whether the accused products are capable of operating in the accused modes without modification is a disputed issue of material fact. (*Id.*).

Plaintiff relies on the testimony of its expert, Dr. Ray Nettleton, who explains that the accused products are already capable of the infringing functionalities—performing coded number authentication and utilizing a permitted callers list in the two accused modes—when sold to customers, without the need for customer modification. (D.I. 199-1 at 20, ¶ 55). Dr. Nettleton states that AT Commands[6] from the user simply serve to enable or activate functionality that

---

[6] At a basic level, both parties agree that AT Commands are commands that an external device can send in order to communicate remotely with modems and instruct them to perform various functions. (D.I. 177 at 10 n.4; D.I. 198 at 9 n.4). The parties dispute, however, whether AT Commands merely instruct modems to perform functions already supported by the firmware's program code or reprogram modems to give them new functionality. (D.I. 177 at 10 n.4; D.I. 198 at 9 n.4).

already exists in the firmware, rather than providing the modules with new functionality. (*Id.* at 20–22, ¶¶ 55–56, 60). Plaintiff also relies on the testimony of Defendants' Rule 30(b)(6) witness, Marco Contento, who admitted that the accused products, when first sold to customers, already contain the program code for performing the accused functionality. (D.I. 199-4 at 13, Tr. pp. 43–44). According to Plaintiff, therefore, Contento admitted that AT commands are merely instructions to execute program code that already exists in the firmware and do not in any way modify the program code that resides on the firmware. (*Id.*). Plaintiff summarizes this testimony by asserting that "the proper technical understanding of AT commands is that they are merely instructions that 'tell the module to perform a function that the module already knows how to perform.'" (D.I. 198 at 15).

There are disputed issues of material fact precluding an award of summary judgment on this issue. Plaintiff's expert, Dr. Nettleton, as well as Defendant's Rule 30(b)(6) witness, Marco Contento, have offered testimony that characterizes AT Commands as little more than a remote control telling the accused modules to operate in a different mode—a mode they are already capable of operating in. (D.I. 199-1 at 20–22, ¶ 55–56, 60; D.I. 199-4 at 13–14, Tr. pp. 43–44). If a jury were to credit this testimony, and find that AT Commands simply activate software program code that already exists in the accused modules, Plaintiff could prove infringement by showing that the accused modules are capable of operating in the two accused modes under *Finjan* and *Fantasy Sports*. Just as in *Finjan*, the mere fact that users would need to activate the accused modes by sending AT Commands would "not detract from or somehow nullify the existence of the claimed structure in the accused software." *Finjan*, 625 F.3d at 1205.

Defendants, on the other hand, rely solely on Dr. Nettleton's responses to a line of questioning by defense counsel as purportedly conclusive proof that AT Commands "program,"

18

and therefore fundamentally modify, the accused modules.  Even if I were to accept the rather

strained notion that Dr. Nettleton's answers to these questions are clear admissions that AT

Commands modify the accused modules,[7] these statements are directly contradicted by the

clearer statements in Dr. Nettleton's expert report and the admissions of Defendants' Rule

30(b)(6) witness.  (D.I. 199-1 at 20–22, ¶¶ 55–56, 60; D.I. 199-4 at 13–14, Tr. pp. 43–44).  To

the extent Defendants think they caught Dr. Nettleton in a "smoking-gun" moment, based on his

"admission" contradicting his expert report, these statements would only go toward his

credibility as a witness and the weight a jury might accord his testimony.  Accordingly, I have

little difficulty in concluding that Defendants are not entitled to summary judgment on these

grounds, as there are disputed issues of material fact.

### 3. Technical Non-Infringement Arguments

Defendants argue that even if the Court rejects its first two non-infringement

arguments—which it now has—their accused products, even after the accused modes are

activated, still do not infringe.  (D.I. 177 at 19–20).  They raise three technical arguments,

asserting that various features of its accused modules do not meet the claim limitations of the

'010 patent, each of which I will consider in turn.  (*Id.* at 20–21).  Plaintiff's position is that each

of these arguments "implicates material disagreements between the parties' respective expert

witnesses concerning factual and claim construction matters" and are therefore "not susceptible

to summary judgment."  (D.I. 198 at 24).  To begin, I note that is well-settled that determining

---

[7] It is hardly clear that the cited portions of Dr. Nettleton's testimony actually support Defendants' argument that AT Commands fundamentally modify the accused products.  For instance, one line of questioning that Defendants rely upon went as follows:

> Q. Did you use [AT Commands] to program the modems?
> A. I did not program the modems, no, in the sense of writing the software for them.
> Q. Did you use AT commands to program the modems?
> A. Yeah.  In the sense that programming means providing commands, yes.

(D.I. 178-3 at 41, Tr. p. 16:16–24).  Notably, the word "program" in this exchange comes from defense counsel.

whether an accused product satisfies all the elements of a patent claim, as construed by a district court, "is a question of fact, to be submitted to a jury." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996) (internal quotation marks omitted).

### a. The Whitelist is not a List of "Permitted Callers"

Defendants argue that the Whitelist feature of its accused products is not a list of "permitted callers" as described in the '010 patent, because the '010 patent "requires calls from unknown numbers to be terminated,"[8] while its accused "modules accept and store messages from numbers that are *not* on the whitelist." (D.I. 177 at 20). To support this argument, Defendants rely on the report of their expert, Kimmo Savolainen. He ran a test on the accused products when no numbers were present in the whitelist. Mr. Savolainen concluded that the accused modules stored the identifying number of callers even when they were not on the whitelist, thereby not "rejecting" such calls. (D.I. 178-2 at 62–63, ¶¶ 65–67). In addition, Defendants again point to several deposition statements by Plaintiff's expert, Dr. Nettleton, which Defendants suggest support their position. (D.I. 178-3 at 42, Tr. pp. 33–36). Plaintiff presents the expert testimony of Dr. Nettleton, who criticizes the methodology of Mr. Savolainen for testing "a whitelist that was unpopulated with any telephone numbers whatsoever and thus was necessarily unable to filter any type of incoming calls," rendering his findings "completely

---

[8] In assessing this argument, I do not necessarily purport to agree with Defendants' characterization of what the '010 patent and my claim construction require. Defendants make this argument that the '010 patent requires calls from unknown callers to be rejected by reading a limitation into the claims from the specification, based on an alternative embodiment described in the specification. ('010 patent, col. 9, ll. 50–52) In direct contradiction to Defendants' assertion, the '010 patent does not *require* calls from unknown numbers to be terminated. The specification merely suggests this is an optional, alternative embodiment. (*Id.* ("Alternatively, the programmable communicator *may* include circuitry to terminate the calls of non-permitted callers automatically." (emphasis added))). My previous construction of "permitted callers" also does not designate the way that incoming calls received from numbers not on the permitted caller list must be handled. It only affirmatively states that the programmable communicator device will accept incoming calls from numbers on the permitted callers list. (D.I. 94 at 7 (construing "permitted callers" to mean "A telephone number or IP address on a list of numbers that are designated to cause the programmable communicator to accept an incoming call received from that number.")).

irrelevant to determining whether the white lists in the accused products are capable of serving as 'permitted callers' lists . . . ." (D.I. 199-3 at 8–9, ¶9). Dr. Nettleton also disagreed with the position of Defendants' expert that the accused modules are not "rejecting" a call when they merely store identifying information in memory, "because nothing else is done with it." (D.I. 178-3 at 66, Tr. p. 236:22–24). Because this conflicting expert testimony creates genuine issues of material fact as to this non-infringement contention, summary judgment is not appropriate.

### b. The Whitelist and Firewall Do Not Store Numbers "Corresponding to a Monitoring Device"

Defendants also argue that their accused whitelist and firewall features do not necessarily store numbers that "correspond [] to a monitoring device" as described in the claims of the '010 patent, because the accused modules do not "send *outgoing* alerts to numbers on the whitelist or firewall, which relate exclusively to *incoming* calls." (D.I. 177 at 20). Once more, Defendants' only evidence to support this contention is two deposition statements by Plaintiff's expert, Dr. Nettleton. (*Id.*). Plaintiff points to the expert testimony of Dr. Nettleton, who opined that the accused products meet this specific claim limitation. (D.I. 198 at 11 (citing D.I. 199-3 at 9, ¶ 10)). Specifically, Dr. Nettleton stated that "the accused white lists are capable of storing telephone numbers belonging to *any type* of remote device without restriction. As such, a telephone number 'corresponding to an at least one monitoring device' is clearly among the types of telephone numbers that can be stored in the white lists." (D.I. 199-3 at 9, ¶ 10).

Again, because Dr. Nettleton expressly opined that the accused products meet this specific claim limitation, any statements he made that Defendants argue are inconsistent with this declaration only go to the weight that his testimony would be accorded. They do not establish the absence of a genuine issue of material fact. Defendants' argument also appears to be legally baseless, as the crux of this argument is merely a reiteration of its earlier argument that the

claims of the '010 patent are not directed to functional capability, an argument that I have already rejected. (D.I. 177 at 20, D.I. 230 at 12). In any event, because there are disputed issues of material fact, Defendants are not entitled to summary judgment on this theory of non-infringement.

### c.   There is no Designated and Unique "Coded Number"

Defendants make several additional non-infringement arguments based on their interpretation of various terms used in this court's claim construction of the term "coded number." (D.I. 177 at 20–21). Defendants assert that this Court's construction of "coded number" requires a fixed number because the plain and ordinary meaning of "designated" "implies that something is chosen or selected." (*Id.* at 21; *see also* D.I. 94 at 9 (construing "coded number" to mean "A designated, unique sequence of characters")). Accordingly, Defendants argue that the accused MD5 cryptographic hash value (when the accused product is used in SMS digest mode) is not a fixed number, but rather "varies based on the useful text of the message being transmitted, and cannot be known before a message is received." (D.I. 177 at 21). According to Defendants, the accused features are not "known and stored beforehand" and therefore are not "designated" as described in the court's claim construction. (*Id.*). Defendants rely on the expert report of Dr. Seth James Nielson as support for this plain and ordinary meaning of designated. Dr. Nielson emphasizes that the MD5 hash of the useful text and the password is "computed," which, to one of skill in the art, is not the same as being "designated." (D.I. 178-4 at 16–17, ¶¶ 56–59). Defendants also argue that the password (when the accused product is used in TCP server mode) has "no minimum length—it can even consist of a single character." (D.I. 177 at 21). Defendants essentially contend, therefore, that a user could set a

password that contained too few characters to be considered "unique," as stated in the Court's claim construction. (*Id.* at 21).

Plaintiff responds by presenting the expert opinion of Dr. Nettleton, who, citing the *American Heritage Dictionary for the English Language*, argues that the plain and ordinary meaning of "designate" is "to indicate or specify." (D.I. 199-3 at 25, ¶36). Plaintiff also contends that Dr. Nielson's definition of designate was, as he admitted in his deposition, derived from his "use of the English language" and otherwise "unsupported by any citation to dictionaries, reference materials, industry usages, or prior art . . . ." (D.I. 198 at 13 (citing D.I. 178-4 at 118–22)). Dr. Nettleton ultimately opined that, under the correct definition of "designate," an "MD5 algorithm clearly indicates or specifies a particular hash value output 'coded number' that is unique for a given message input." (D.I 198 at 13 (citing D.I. 199-3 at 25, ¶36)). Plaintiff also argues, relying on Dr. Nettleton's testimony, that "there is no requirement in the Court's claim construction that the claimed 'coded number' needs to be 'preset,' and the prosecution history teaches that the use of a 'coded number' that is 'preset' is merely one optional approach that is nowhere required by the patent." (*Id.* at 14 (emphases removed) (citing D.I. 199-3 at 26–27, ¶¶ 38, 40)). With regard to the uniqueness of the coded number, Plaintiff relies on the testimony of Dr. Nettleton, who states that the accused products are capable of using passwords of up to 50 characters in length, which is sufficiently unique, especially when compared to the 8 character PUK code[9] disclosed in the patent specification as an example of a coded number. (D.I. 198 at 15 (citing D.I 199-3 at 9–10, ¶11)). Moreover, Plaintiff argues that Defendants' expert, Mr. Savolainen, testified that even a sequence two

---

[9] "The PUK code is a unique identifier, which is different for every [Subscriber Identity Module or SIM Card]." ('010 patent col. 9, ll. 29–32). The patent further explains that, "The choice of the PUK is made by way of example only and any similar unique coding may be used for the purpose of the invention." (*Id.* col. 9, ll. 32–34).

characters long could be considered sufficiently unique under the court's construction. (D.I. 198 at 15).

All of Defendants' non-infringement contentions relating to this Court's "coded number" construction are rebutted by Plaintiff's expert (as cited above), and therefore create genuine disputes of material fact. Accordingly, Defendants' non-infringement arguments relating to this claim term are not amenable to summary judgment.

### 4. Indirect Infringement Arguments

#### a. No Direct Infringement

First, Defendants argue that because there is no record evidence of any third party having operated the devices in an infringing manner, there can be no indirect infringement. (D.I. 177 at 21–22). It is clear, however, that this portion of Defendants' brief merely rehashes its argument that the '010 patent presents method steps that need to be performed rather than requiring functional capability, arguments that I already considered and rejected in Section III.A.1 of this opinion. Defendants also recycle their contention that the accused modules require user modification before they are even capable of infringing (D.I. 177 at 22), which I stated was a disputed issue of material fact in Section III.A.2 of this opinion. Accordingly, I decline to consider these arguments anew here.

#### b. No Evidence of Specific Intent to Support Induced Infringement Claim

35 U.S.C. § 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "In order to prevail on an inducement claim, the patentee must establish first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1312 (Fed.

Cir. 2007) (internal quotation marks omitted). In other words, "inducement requires evidence of

culpable conduct, directed to encouraging another's infringement, not merely that the inducer

had knowledge of the direct infringer's activities." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293,

1306 (Fed. Cir. 2006) (en banc). "[S]pecific intent may be inferred from circumstantial evidence

where a defendant has both knowledge of the patent and specific intent to cause the acts

constituting infringement." *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1342 (Fed. Cir.

2008). The knowledge requirement may be satisfied by showing actual knowledge or willful

blindness. *See Global–Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011). "The

requirement that the alleged infringer knew . . . his actions would induce actual infringement

necessarily includes the requirement that he or she knew of the patent." *DSU Med. Corp.* 471

F.3d at 1304.

Defendants argue that Plaintiff failed to prove the requisite specific intent to cause users

to infringe. (D.I. 177 at 22). Again, however, Defendants' arguments rely on their recurring

contentions that the '010 patent does not properly claim "capability." (*Id.* at 23 (arguing that

"[t]here is no evidence that Telit encouraged or instructed customers to program the firewall or

whitelist in the two accused modes of operation" and that Telit "did not 'specifically intend' that

any customer use the two accused modes.")). Under this line of argument, Defendants rely on

the opinions of their expert, Mr. Savolainen, who opined that customers are unlikely to use the

two accused modes at all. (D.I. 178-4 at 42–44).[10] Defendants argue further that merely

distributing manuals and technical support, without more, is insufficient to support liability for

---

[10] Defendants also cite two isolated pages from the deposition of Ken Bednasz to support this point. (D.I. 177 at 23 (citing D.I. 178-4 at 3, Tr. pp. 88–89). Upon reviewing these pages, it is not clear to me that anything from the cited pages supports this point, and Defendants provide no explanation, aside from the bare citation, as to how the testimony supports this point. Because this testimony is ultimately not important to my decision on this issue, however, I decline to address it further.

inducement. (*Id.*). In their Reply Brief, Defendants also raise for the first time the argument that knowledge of the patent, for purposes of proving the intent required for induced infringement, cannot be proven based on the filing of the lawsuit alone. (D.I. 230 at 13).[11]

Plaintiff, on the other hand, frames its inducement allegations in terms of product capability, consistent with its earlier arguments. (D.I. 198 at 14). Plaintiff first asserts that Defendants had knowledge of the '010 patent and the likelihood that their products infringed as a result of the filing of the complaint in this action. (*Id.* at 24) Under Plaintiff's infringement theory, the accused products as sold meet all claim limitations of the '010 patent except for the "wireless communications circuit" limitation, because this Court's claim construction (D.I. 94 at 15) requires the inclusion of an antenna. (D.I. 198 at 7). Plaintiff's expert, Dr. Nettleton, explained that the products as first sold do not include antennas, but contain pads or connectors specially designed for connecting the modules to antennas. (D.I. 199-1 at 15, ¶ 41). Dr. Nettleton also opined, with citations to specific documents, that "Telit provides its customers or end-users with technical literature that instructs and encourages customers or end-users to connect a GSM antenna to the module's antenna solder pad." (*Id.*). Plaintiff also points to the deposition testimony of Defendants' Rule 30(b)(6) witness, Marco Contento, who admitted that in order to use the accused modules at all, the modules must be physically embedded into a host device and connected to an antenna. (D.I. 199-4 at 15–16, Tr. pp. 49–50, 53–54). Under Plaintiff's theory of infringement, once an accused product is connected to an antenna—which it appears it must be in order to use it at all—"it then literally meets and embodies every limitation

---

[11] Because Defendants raise this argument for the first time in their Reply Brief—in a cursory manner and without any citation to legal authority—I consider it waived. I note, however, that this Court has previously rejected this argument and held that "there is no legal impediment to having an indirect infringement cause of action limited to post-litigation conduct." *Walker Digital, LLC v. Facebook, Inc.*, 852 F. Supp. 2d 559, 565 (D. Del. 2012).

of" the asserted claims in the '010 patent, because the various modules then possess all of the claimed functionality. (D.I. 198 at 8). Plaintiff therefore asserts that, because Defendants sell the accused devices with knowledge that users must connect them to antennas and expressly encourage users to do so, a reasonable jury could find that Defendants had the requisite specific intent to induce infringement. (*Id.* at 24–25).

Because I have already concluded that the '010 patent claims functional capability, I find Defendants' arguments that they did not actively instruct users to utilize the two accused modes to be legally irrelevant. Defendants have thus not provided any convincing argument or testimony as to Plaintiff's relevant argument that they induced by selling the accused modules and instructing users to connect the modules to antennas, rendering them fully capable of the claimed functionality. Based upon Plaintiff's infringement allegations directed to this relevant inquiry, supported by the expert testimony of Dr. Nettleton, I cannot conclude that a reasonable jury would be unable to find that Defendants knowingly induced infringement by the end-users of its modules and likewise possessed the specific intent to encourage them to do so. I will therefore not grant Defendants' summary judgment motion of no induced infringement.

### c. No Contributory Infringement

35 U.S.C. § 271(c) provides:

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

This provision "reflect[s] patent law's traditional staple of commerce doctrine . . . that distribution of a component of a patented device will not violate the patent if it is suitable for use

in other ways." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932 (2005). "In sum, where an article is good for nothing else but infringement, there is no legitimate public interest in its unlicensed availability, and there is no injustice in presuming or imputing an intent to infringe." *Id.* (citations and internal quotation marks omitted).

The crux of Defendants' argument as to contributory infringement is that its accused modules have substantial non-infringing uses, because they can operate in non-infringing modes. (D.I. 177 at 23–25). Yet again, however, Defendants' entire argument relies on the assumption that the '010 patent does not claim functional capability, but instead requires that the accused devices actually be operated in the infringing modes. (D.I. 230 at 14 ("M2M's sole argument . . . relies implicitly on [its] argument that the module's inchoate capabilities render them infringing without further modification.")). Plaintiff, on the other hand, again points to the expert opinion of Dr. Nettleton, in arguing "that once customers connected the accused products to antennas as they admittedly must always do, the products then satisfy all of the apparatus claim limitations such that 'any use' is direct infringement." (D.I. 198 at 25 (citing D.I. 199-1 at 11–12, ¶ 29)).

I have already concluded that the '010 patent properly claims functional capability, rendering Defendants' continued reliance on its argument to the contrary irrelevant. It appears undisputed that in order to use one of Defendants' accused products at all, it must be connected to an antenna. (D.I. 199-4 at 15–16, Tr. pp. 49–50, 53–54). Defendants do not otherwise argue that this is not the case. Dr. Nettleton opined that once a product is connected to an antenna, it has the full functional capability to meet all the claim limitations of the '010 patent. (D.I. 199-1 at 11–12, ¶ 29). A device properly claiming functional capability "may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation." *Finjan*, 626 F.3d at 1204 (quoting *Intel*, 946 F.2d at 832).

Accordingly, a reasonable jury could conclude that the accused products have no use if they are not connected to an antenna. Once a user connects an accused product to an antenna, the resulting device will contain the accused functionality, and, viewed in the light most favorable to Plaintiff, will infringe. Summary judgment is therefore not warranted as to this issue.

## B.  Motion for Summary Judgment of Invalidity (D.I. 171)

### 1.  Written Description

The written description requirement contained in 35 U.S.C. § 112, ¶ 1 requires that the specification "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Ariad Pharm., Inc., v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (alteration in original) (internal quotation marks omitted). "In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* The written description inquiry is a question of fact. *See id.* Although it is a question of fact, "[c]ompliance with the written description requirement . . . is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).

Defendants argue, relying on the Expert Report of Dr. Seth James Nielson, that "[a] person of ordinary skill in the art would know from reading the '010 patent, that Dr. Wesby was [] not in possession of a device that used an MD5-based authentication process—and that process is not 'similar' to the specification's 'coded number.'" (D.I. 172 at 20 (emphasis in original) (citing D.I. 173-1 at 63–65, ¶¶ 50, 60–62)). In essence, Defendants argue that the authentication process disclosed in the specification of the '010 patent does not adequately demonstrate possession of the more complex authentication process used in the accused products. (*Id.* at 20–

29

21).  Plaintiff points to the testimony of its expert, Dr. Alon Konchitsky, to support its position

that "the '010 patent specification provides adequate written description support for the claim

term 'coded number' as construed by the Court . . . ."  (D.I. 196 at 9 n.3, *id.* at 22 (citing D.I.

197-2 at 3–5, ¶¶ 54–58)).  Plaintiff also critiques Defendants' and Dr. Nielson's legal analysis

and suggests that under a proper interpretation of the written description requirement, Dr.

Nielson's expert report could even be interpreted to support a finding that the '010 patent

specification did in fact adequately disclose the claimed invention.  (D.I. 196 at 9–11, 22).

Because each party presents conflicting expert testimony, there are genuine disputes of material

fact and I cannot conclude that a reasonable fact finder would be unable to return a verdict for

Plaintiff.  Accordingly, summary judgment on Defendants' written description argument is not

warranted.

### 2.  Indefiniteness

In *IPXL Holding*, the Federal Circuit held that when a claim "recites both a system and

the method for using that system, it does not apprise a person of ordinary skill in the art of its

scope, and [] is therefore [indefinite] under section 112, paragraph 2."  *IPXL Holding, L.L.C. v.*

*Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005).  Subsequent decisions by the Federal

Circuit upheld this rule where, as in *IPXL*, the claim language expressly required both an

apparatus and that a user actually use the apparatus.  *See H-W Tech., L.C. v. Overstock.com, Inc.*,

758 F.3d 1329, 1336 (Fed. Cir. 2014) (applying this principle to claim language stating

"'wherein said user completes . . .' and 'wherein said user selects'" (alterations in original));  *In*

*re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1318 (Fed. Cir. 2005) (applying

this principle to claim language stating "'wherein . . . callers digitally enter data' and 'wherein . .*

. callers provide . . . data'" (alterations in original)).  Numerous district courts have described this

rule of law, however, as a narrow one, with the general understanding that "the rule does not

apply to claims containing language simply describing a system as well as the capabilities of the

claimed system; rather, the rule applies to claims describing a system that also require the user of

the recited system to take specific action." *Bayer Pharma AG v. Watson Labs, Inc.*, 2014 WL

4954617, at *6 (D. Del. Sept. 30, 2014) (citing various district court opinions in accord with this

position).

Defendants argue that the claims of the '010 patent are improper hybrid claims, and

therefore are indefinite under the *IPXL Holding* line of cases, because they "cover both the

apparatus and its use." (D.I. 172 at 21–22). The basis of this argument is Defendants' recurring

contention that claim 1 of the '010 patent recites method steps, because a transmission must be

"'*sent* from a programming transmitter and *received* by the programmable communicator . . .'"

(*Id.* at 21 (alteration in original) (quoting '010 patent, claim 1)). Not surprisingly, Defendants'

contentions mirror the argument made in their non-infringement motion, that the '010 patent

does not properly claim capability, but rather method steps. (*Id.* at 22). Once more, the only

expert testimony Defendants provide as to this point is what it characterizes as "admissions"

from Plaintiff's expert, Dr. Nettleton, upon questioning from defense counsel. (*Id.*). Plaintiff

responds by reiterating its argument that the '010 patent claims an apparatus with certain

functional capability. (D.I. 196 at 24–25). Plaintiff cites the testimony of its expert, Dr.

Konchitsky, as supporting the position that the claim language of the '010 patent provides

functional limitations on the apparatus claims, rather than any method steps. (*Id.* at 24 (citing

D.I. 197-6 at 3, ¶3)). Likewise, Plaintiff points to testimony by Dr. Nettleton where he clearly

states that claim 1 "does not describe a process. It describes a module with certain capabilities,"

expressly correcting Defendants' counsel for saying the claim described a "process." (D.I. 197-7 at 3–4).

At oral argument, Defendants' counsel conceded that the viability of their indefiniteness position would rise and fall with the Court's disposition as to the issue of whether the '010 patent properly claims functional capability, which Defendants had already raised and argued in their non-infringement motion. (D.I. 245 at 175). Indeed, the two arguments rely on an identical premise, that claim 1 of the '010 patent requires a user to perform method steps. Because I have already held that this claim language properly claims functional capability, as opposed to method steps, Defendants' indefiniteness argument merits no relief for the same reasons already stated herein. In any event, it is also clear that—unlike in *IPXL*, *Katz*, and *H-W Tech.*—the contested portion of the '010 patent here definitively does not describe an actual user or other third party performing certain actions. ('010 patent, claim 1 ("a processing module for authenticating an at least one transmission sent from a programming transmitter and received by the programmable communicator device . . . .")). The "narrow" *IPXL* line of cases, therefore, does not apply here, because the claims do not "require the user of the recited system to take specific action." *Bayer Pharma*, 2014 WL 4954617, at *6. Accordingly, Defendants' indefiniteness contentions do not warrant summary judgment.

### C.    Motion for Summary Judgment Related to Damages (D.I. 165)

Defendants bring a Motion for Summary Judgment Related to Damages (D.I. 165), which raises three separate issues. The motion is fully briefed. (D.I. 166, 202, 226). First, Defendants argue that they are entitled to summary judgment of no willful infringement. (D.I. 166 at 15–16). Second, Defendants move for summary judgment of no infringement by products made and shipped outside the U.S. (*Id.* at 17–20). Third, Defendants move for summary

judgment of no infringement by Telit Communications PLC, the British parent company of Telit U.S.  (*Id.* at 21–24).

By way of brief background, Telit Communications PLC ("PLC") is a public limited company established in 2004 under the laws of the United Kingdom, with its principal place of business in London.  (D.I. 1 at ¶ 3, D.I. 167-1 at 2, ¶ 3).  Telit U.S. is a Delaware corporation within its principal place of business in North Carolina.  (D.I. 1 at 2, ¶4).  PLC is a holding company that holds all the trading companies of Telit that are established in various countries, including the United States, Italy, Israel, and Korea.  (D.I. 167-2 at 3, Tr. pp. 27–28).  Accordingly, Telit U.S. is a wholly-owned U.S. subsidiary of PLC.  (*Id.* at 3, Tr. p. 27).

### 1.   No Willful Infringement

In order to show willful infringement, a patentee must meet the two-part test set forth by the Federal Circuit in *Seagate*.  *See In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc).[12]  The first, objective prong requires a patentee to "show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent."  *Id.*  "This 'objective' prong of *Seagate* tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement."  *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1319 (Fed. Cir. 2010).  The Federal Circuit later clarified "that the objective determination of recklessness, even though predicated on underlying mixed questions of law and fact, is best decided by the judge as a question of law subject to *de novo* review."  *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1006–07 (Fed. Cir. 2012).

---

[12] The Court understands that the Supreme Court has two cases before it that have questions presented raising the issue of the standard for willfulness.  *See Halo Elecs., Inc. v. Pulse. Elecs., Inc.*; *Stryker Corp. v. Zimmer, Inc.*, 136 S. Ct. 356 (Oct. 19, 2015) (memorandum granting certiorari in consolidated cases).

If the first prong is met, "the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Seagate*, 497 F.3d at 1371. The second prong is a fact question reviewed for substantial evidence. *See SSL Servs., LLC v. Citrix Systems, Inc.*, 769 F.3d 1073, 1090–91 (Fed. Cir. 2014). If a court finds for the alleged infringer with regard to the first prong, "it cannot send the question of willfulness to the jury, since proving the objective prong is a predicate to consideration of the subjective prong." *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236 (Fed. Cir. 2011).

With regard to post-suit willfulness, the Federal Circuit explained in *Seagate*:

> [I]n ordinary circumstances, willfulness will depend on an infringer's prelitigation conduct. It is certainly true that patent infringement is an ongoing offense that can continue after litigation has commenced. However, when a complaint is filed, a patentee must have a good faith basis for alleging willful infringement. So a willfulness claim asserted in the original complaint must necessarily be grounded exclusively in the accused infringer's pre-filing conduct. By contrast, when an accused infringer's post-filing conduct is reckless, a patentee can move for a preliminary injunction, which generally provides an adequate remedy for combating post-filing willful infringement. A patentee who does not attempt to stop an accused infringer's activities in this manner should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct. Similarly, if a patentee attempts to secure injunctive relief but fails, it is likely the infringement did not rise to the level of recklessness.

*Seagate*, 497 F.3d at 1374 (citations omitted).

Here, Defendants argue that Plaintiffs cannot meet the "objective recklessness" standard from *Seagate*, particularly in light of the fact that there is no evidence of pre-suit knowledge or recklessness. The '010 patent issued only three days before Plaintiff filed suit. (D.I. 166 at 16). Defendants argue further that their post-suit conduct does not meet the objective recklessness standard due to the reasonableness of their claim construction, non-infringement, and invalidity defenses. (*Id.*). Plaintiff conceded at oral argument that its willful infringement claim is based solely upon post-litigation conduct. (D.I. 245 at 134). Plaintiff's argument for willfulness

simply goes through each of the defenses Defendants have raised at some point during this litigation and argues why they are unreasonable. (D.I. 202 at 9–10).

The '010 patent issued on January 10, 2012 and Plaintiff filed its Complaint three days later on January 13, 2012. (D.I. 1). Plaintiff did not subsequently move for a preliminary injunction at any point. Accordingly, "[a] patentee who does not attempt to stop an accused infringer's activities in this manner should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct." *Seagate*, 497 F.3d at 1374. To allow a finding of willfulness based solely on post-suit conduct, with nothing more, would punish litigants with the risk of enhanced damages simply for choosing to defend a case on the merits. *See LML Holdings, Inc. v. Pac. Coast Distrib., Inc.*, 2012 WL 1965878, at *5 (N.D. Cal. May 30, 2012). Plaintiff presents no evidence of pre-suit knowledge or conduct tending to establish objective recklessness. Plaintiff simply argues the merits of Defendants' post-suit defenses. It has therefore not provided the necessary clear and convincing evidence to meet the objective first prong of *Seagate*.[13] *See Seagate*, 497 F.3d at 1371. Accordingly, Defendants are entitled to judgment as a matter of law of no willful infringement.[14]

### 2. No Infringement by Products Made and Shipped Outside the U.S.

"The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law." *Microsoft Corp. v. AT & T Corp.,* 550 U.S.

---

[13] I would come to the same conclusion if the standard were a preponderance of the evidence.

[14] Without delving into each and every merits argument raised by Plaintiff in arguing the unreasonableness of Defendants' litigation conduct, I note that Defendants' potentially dispositive claim construction arguments were reasonable, which in itself also prevents Plaintiff from proving the objective prong of *Seagate. See Tarkus Imaging, Inc. v. Adobe Sys., Inc.,* 867 F. Supp. 2d 534, 537 (D. Del. 2012) ("Although the Court did not ultimately adopt [Defendant's] constructions for these terms, the fact that [Defendant] asserted reasonable constructions under which its products would not infringe a finding that the first prong of *Seagate* is satisfied." (citation omitted)). In fact, the Court invalidated the '197 patent based on Defendants' claim construction arguments. (D.I. 94 at 18–20). Moreover, Defendants provided reasonable indefiniteness arguments as to claims of the '010 patent that, while ultimately not adopted by the Court, would have disposed of the instant action in its entirety. (D.I. 94 at 10–13, D.I. 237 at 2–10).

437, 454–55 (2007). "It is the general rule under United States patent law that no infringement occurs when a patented product is made and sold in another country." *Id.* at 441; *see also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013) ("It is axiomatic that U.S. patent law does not operate extraterritorially to prohibit infringement abroad.").

"Because contributory infringement has the same territorial requirements as direct infringement, [a] Court's analysis with respect to direct infringement applies." *Largan Precision Co. v. Genius Elec. Optical Co.*, 86 F. Supp. 3d 1105, 1117 (N.D. Cal. 2015). The Federal Circuit has "not deemed a sale to have occurred within the United States for purposes of liability under § 271(a) based solely on negotiation and contracting activities in the United States when the vast majority of activities underlying the sales transaction occurred wholly outside the United States." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1378 (Fed. Cir. 2014), *cert. granted on other grounds*, 136 S. Ct. 356 (2015). "For such a sale, one must examine whether the activities in the United States are sufficient to constitute a 'sale' under § 271(a), recognizing that a strong policy against extraterritorial liability exists in the patent law." *Id.* In *Halo*, a case "where the negotiations occurred in the United Sates, but the contemplated sale occurred outside the United States," the Federal Circuit held that a sale had not occurred for purposes of § 271(a) where "the products under discussion were manufactured, shipped, and delivered to buyers abroad." *Id.* at 1381, 1379. Despite the plaintiff's argument in *Halo* that negotiations and contracting activity took place in the United States, the Federal Circuit found this insufficient, stating that "[a]ny doubt as to whether [Defendant's] contracting activities in the United States constituted a sale within the United States under § 271(a) is resolved by the presumption against extraterritorial application of United States laws." *Id.* at 1380.

Although the Federal Circuit in *Halo* did "not reach [the plaintiff's] argument that the place where a contract for sale is legally formed can itself be determinative as to whether a sale has occurred in the United States,"[15] *Halo*, 769 F.3d at 1379 n.1, several district courts have. *See, e.g., Ziptronix, Inc. v. Omnivision Techs., Inc.*, 71 F. Supp. 3d 1090, 1096 (N.D. Cal. 2014) ("[A]t most, the evidence shows that the TSMC entities engaged in conduct amounting to domestic contracts for foreign sales—that is, contracts executed in the United States but contemplating strictly foreign manufacture and delivery. Such conduct does not constitute direct infringement because the accused wafers are manufactured and sold outside the United States."); *Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 657–58 (E.D. Tex. 2013) ("The question stemming from Lake Cherokee's position is whether a contract between two U.S. companies, negotiated and executed within the United States, for the sale of a patented invention with delivery and performance *outside* of the United States, constitutes a sale under § 271(a). Despite the factual differences, the Federal Circuit's analysis in *Transocean* compels this Court to answer that question in the negative."). In *Lake Cherokee*, the district court granted summary judgment of no liability for sales of "products shipped to customers located outside the United States and which never reach the domestic United States market." *Id.* at 658. The court also, however, denied summary judgment in part for "accused products manufactured and delivered abroad but imported into the United States market by downstream customers," because there "remain[ed] a genuine issue of material fact." *Id.*[16]

---

[15] In *Halo*, the Defendant also received actual purchase orders abroad and was paid abroad by contract manufacturers, rendering the only substantive activity taking place in the U.S. contract and pricing negotiations. *See Halo*, 769 F.3d at 1379.

[16] In *Lake Cherokee*, the plaintiff's expert had testified that approximately 23% of the accused products found their way back into the U.S. as part of a finished product. *See Lake Cherokee*, 964 F. Supp. 2d at 657. Accordingly, the court allowed Plaintiff to proceed on 23% of its damages base. *See id.* at 658.

"An offer to sell is a distinct act of infringement separate from an actual sale. An offer to sell differs from a sale in that an offer to sell need not be accepted to constitute an act of infringement." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1308 (Fed. Cir. 2010). With regard to "offers to sell," the Federal Circuit has stated that:

> An offer to sell, in order to be an infringement, must be an offer contemplating sale in the United States. Otherwise, the presumption against extraterritoriality would be breached. If a sale outside the United States is not an infringement of a U.S. patent, an offer to sell, even if made in the United States, when the sale would occur outside the United States, similarly would not be an infringement of a U.S. patent.

*Halo*, 769 F.3d at 1381. Accordingly, "[t]he focus should not be on the location of the offer, but rather the location of the future sale that would occur pursuant to the offer." *Transocean*, 617 F.3d at 1309. In *Transocean*, the Federal Circuit held that an offer made in Norway by a U.S. company to sell a patented invention to another U.S. company for delivery and use in the U.S. constituted an offer to sell under § 271(a). *See id.* Likewise, in *Halo*, "where the negotiations occurred in the United States, but the contemplated sale occurred outside of the United States," the Federal Circuit concluded that "[Defendant] did not directly infringe the [] patents under the 'offer to sell' provision by offering to sell in the United States the products at issue, because the locations of the contemplated sales were outside the United States." *Halo*, 769 F.3d at 1381.

Here, it is undisputed that all of Defendants' accused products are manufactured outside of the U.S. (D.I. 242 at 1; D.I. 167-2 at 157). The parties also agree that there are two subsets of accused products. The first category of accused products are those which are directly shipped to a U.S. location. Neither party contests that this subset of products reaches the United States, and they are therefore not the subject matter of the present motion. (D.I. 202 at 11; D.I. 245 at 135). However, there is a second subset of products which, despite the order being booked by Telit

U.S. and payment being received in the U.S., the customer requests that the accused products be shipped to a contract manufacturer abroad. (D.I. 167-2 at 76–77; D.I. 202 at 11). Defendants' records list the address where each customer requested the purchased products be shipped. (D.I. 205-3). Plaintiff's damages expert, Richard Bero,[17] included in his damages calculation "those sales which are ordered by a customer in the United States through Telit's United States company, invoiced in the United States and paid in the United States, but may be shipped by Telit to the United States customer's overseas manufacturer to incorporate in the end products." (D.I. 167-2 at 157). Mr. Bero's expert report also indicated, however, that "in the event the Court determines that such sales are not subject to damages, I have also calculated the sales shipped directly to United States' customers separately." (*Id.* at 157 n.4). At oral argument, the parties indicated that, under Mr. Bero's calculations, sales shipped abroad would account for approximately an additional 33% (or $1 million) in damages. (D.I. 245 at 147). The crux of Defendants' present motion therefore is an effort to exclude those products manufactured and shipped abroad from Plaintiff's damages calculation, because there is no evidence that any of those products actually ever entered the United States.

Specifically, with regard to its contributory infringement claim, Defendants argue that for the products manufactured and shipped abroad there was no "sale" within the U.S under governing case law, because the location of manufacture and shipment designates where the sale took place. (D.I. 166 at 17–18). Defendants further contend that negotiations and contracting within the United States, even by two U.S. companies, does not constitute a sale under § 271 when those contracts agree on delivery and performance outside of the United States. (*Id.* at 18). Likewise, Defendants assert that an offer to sell, in order to constitute infringement, must

---

[17] Defendants have a motion pending to exclude the testimony of Plaintiff's two damages experts, including Mr. Bero. (D.I. 168). A *Daubert* hearing is presently scheduled for January 6, 2016. (D.I. 244).

ultimately contemplate sale in the United States rather than a foreign country. (*Id.* at 19).

Defendants emphasize throughout their briefing that Plaintiff "has not identified any evidence

that products delivered abroad were ever imported into the U.S." (*Id.*). Accordingly, Defendants

argue that without proof that any products from this subset of accused products entered the U.S.,

the presumption against extraterritoriality should prevent the Plaintiff from including the foreign

sale of those products in its damages calculation. (*Id.* at 17). With regard to Plaintiff's

inducement claim, Defendants argue that even if its accused products were imported into the

U.S. by third parties, Telit U.S. itself neither imported these accused products into the U.S. nor

induced or otherwise intended that third parties import its accused products into the U.S. after

being delivered abroad. (*Id.* at 19–20). In Defendants' view, once Telit U.S. completes its

delivery obligations, it has no control over where its products are shipped thereafter and has no

obligation to track where its products ultimately end up. (*Id.* at 20).

Plaintiff characterizes the issue before the Court differently, as "seeking to hold Telit

accountable for products it sells to U.S. customers even though some of those products are

shipped by Telit to a facility abroad *prior to being imported into the United States*." (D.I. 202 at

10 (emphasis added)). The key difference here is that Plaintiff argues there is evidence on the

record that those products that are ordered in the U.S. and shipped abroad are eventually

imported into the United States, meaning there is a "classic factual dispute" about the amount of

products shipped abroad that eventually reach the United States. (*Id.*). Plaintiff points to the

testimony of Defendants' Rule 30(b)(6) representative, Yariv Dafna, as admitting that some

products are delivered to foreign contract manufacturers to be embedded into machines before

being imported back into the U.S. (*Id.* at 11 (citing D.I. 205-1 at 15, Tr. pp. 51:5–53:6)). Based

on these "admissions," Plaintiff contends, there is a factual dispute about how many accused

products were imported into the U.S. after being embedded into end products. (*Id.*). Plaintiff

purports to prove how many of such products reached the U.S. by presenting testimony to the

jury concerning:

> 1) Telit's own testimony that it relies on information from ABI Research to
> determine the number of Telit products actually entering the U.S., 2) Telit's willful
> lack of tracking of where its products end up, 3) Telit's own documents that identify
> for each of these transactions the U.S. customer placing the order with the U.S.
> point of contact, and 4) Telit's practice of booking [] these sales through its U.S.
> subsidiary, [indicating] the products are meant for [a] U.S. customer as a
> multinational company intending use outside of the U.S. would be able to place the
> order with a non-U.S. Telit entity.

(*Id.* at 11–12 (citations omitted)).

The problem with Plaintiff's argument, however, is that Defendant's Rule 30(b)(6)

representative never actually stated that the products shipped abroad are eventually imported into

the U.S. or that Defendants are aware of that happening. In the deposition passage Plaintiff cites

for this proposition, Mr. Yafna merely states that sometimes U.S. customers ask for the modules

to be shipped directly to the customer's contract manufacturer abroad. (D.I. 205-1 at 15, Tr. pp.

51:5–53:6). He says nothing indicating that the products, once incorporated into an end product

by the contract manufacturer, reach the United States or that Defendants know or intend for these

products to reach the United States.[18]  Plaintiff therefore offers no proof that a single accused

module shipped abroad ever makes its way into the United States. Rather, Plaintiff's assertions

---

[18] For this reason, Plaintiff's reliance on *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365 (Fed. Cir. 2013) and *Spansion, Inc. v. ITC*, 629 F.3d 1331 (Fed. Cir. 2010), is unpersuasive. In *SynQor*, the Federal Circuit merely affirmed a jury verdict of inducement for "sell[ing] the accused products overseas with knowledge that they would be imported into the United States," specifically because there was enough evidence on the record for the jury to conclude the Defendant had knowledge of the patent and of the fact that its products would be imported into the U.S. *See SynQor*, 709 F.3d at 1380, 1384. Likewise, in *Spansion*, the Federal Circuit merely upheld the ITC's findings that the plaintiff "proved by a preponderance of the evidence that [the accused] products are incorporated into finished downstream products that are imported, sold for importation, or sold after importation into the United States." *Spansion*, 629 F.3d at 1354 (internal quotation marks omitted). Here, Plaintiff has not offered any such evidence that Defendants had knowledge that the accused products will enter the U.S.

that the accused products do make it back into the United States seem to be based on mere assumption.

Much like in *Halo*, *Ziptronix*, and *Lake Cherokee*—with regard to the products shipped abroad—the present matter concerns domestic contracts for foreign sales. *See Halo*, 769 F.3d at 1379; *Ziptronix*, 71 F. Supp. 3d at 1096; *Lake Cherokee*, 964 F. Supp. 2d at 657–58. Accordingly, the actual "sales" here occurred abroad. Likewise, with regard to an "offer to sell," because the focus is not on "the location of the offer, but rather the location of the future sale that would occur pursuant to the offer," Plaintiff cannot prove an infringing offer to sell by merely relying on the fact that Defendants offered to sell their accused products through their U.S. subsidiary. *Transocean*, 617 F.3d at 1309; *see also Halo*, 769 F.3d at 1381. Moreover, unlike in *Lake Cherokee*, Plaintiff here has not presented an estimate, whether by expert testimony or some other evidence, as to how many of the accused products shipped abroad ultimately made it into the U.S. *See Lake Cherokee*, 964 F. Supp. 2d at 657–58. When such an estimate was offered, the Court in *Lake Cherokee* denied summary judgment as to the 23% of accused products the plaintiff's expert estimated made their way into the U.S., because this testimony created a genuine issue of material fact for a jury to consider. *See id.* at 658. Here, however, neither Plaintiff nor its expert provides any such breakdown. Instead, Plaintiff seeks damages on all products shipped abroad by vaguely asserting that it should be Defendants' burden to prove which products were not later imported to the U.S. (D.I. 167-2 at 157; D.I. 202 at 10–12; D.I. 241 at 1–2). Each of the four categories of evidence Plaintiff purports to present to the jury on this issue do not actually identify any genuine issues of material fact, for the reasons discussed below.

First, Plaintiff's suggestion that it will present facts to the jury concerning "Telit's willful lack of tracking of where its products end up" is perplexing. (D.I. 202 at 11). The suggestion that once Telit U.S. has delivered its products to the location requested by a customer it should be required to track where its products end up after being incorporated into other finished products—even when handled by multiple contract manufacturers—finds no basis in the law. At oral argument (D.I. 245 at 158–59), Plaintiff raised the argument for the first time that *Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 899 F.2d 1171 (Fed. Cir. 1990), stood for the proposition that "fundamental principles of justice require [the court] to throw any risk of uncertainty [in calculating damages] upon the wrongdoer rather than upon the injured party."[19] (D.I. 241 at 1 (quoting *Beatrice Foods*, 899 F.3d at 1175) (internal quotation marks omitted)). Accordingly, Plaintiff argued, "any risk of uncertainty as to whether any specific products Telit's U.S. subsidiary sold (and booked) to a U.S. customer (including invoicing and receiving payment in the U.S.) but delivered to an intermediate product manufacturer falls on Telit." (D.I. 241 at 2). However, as Defendants point out, *Beatrice Foods* did not provide a generic pronouncement that uncertainty in calculating damages should be borne by an alleged infringer. (D.I. 242 at 1). Rather, the defendant in *Beatrice Foods* was referred to as a "wrongdoer" because it intentionally destroyed documents concerning the extent of its sales of infringing products and then later argued that the plaintiff's damages calculation was too imprecise. *See Beatrice Foods*, 899 F.2d at 1173–76; *id.* at 1175 ("An infringer can not destroy the evidence of the extent of its wrongdoing, and limit its liability to that which it failed to destroy."). Plaintiff's non-briefed, last minute attempt to shift the burden of proof on damages at oral argument by relying on *Beatrice Foods* is a Hail Mary pass. Moreover, I agree with Defendants that

---

[19] Because it had not been briefed, I allowed each party to submit a two-page letter brief concerning the significance of *Beatrice Foods* and its progeny (D.I. 245 at 159), which each party did. (D.I. 241; D.I. 242).

Plaintiff's effort to shift this burden under *Beatrice Foods* is an implicit acknowledgement that Plaintiff has failed to present any evidence from which a jury could determine how many products sold abroad actually made their way into the U.S., let alone that any products made their way into the U.S at all.  (D.I. 242 at 1).

Second, and relatedly, Plaintiff purports to present information to the jury concerning "Telit's own documents that identify for each of these transactions the U.S. customer placing the order with the U.S. point of contact."  (D.I. 202 at 11–12 (citing D.I. 205-3)).  It is difficult to see what this document would prove to the jury aside from what is already agreed upon by the parties: that Telit U.S. entered into contracts in the United States to ship products both to the United States and to contract manufacturers abroad.  Defendants kept records of purchases by their customers during the relevant time periods, which show where the products were shipped, and they produced them in this litigation.  (D.I. 203-5).  As Defendants correctly point out, Plaintiff could have taken some third-party discovery of these customers to prove that at least some accused products were eventually imported into the U.S.  (D.I. 242 at 2).  Even a few concrete examples of accused products shipped abroad coming into the U.S. could conceivably have provided Plaintiff's expert with a reasonable basis to estimate how many accused products eventually made it into the U.S.  Instead, no such discovery was taken and Plaintiff has no evidence of products coming into the U.S. to present to the jury.

Third, Plaintiff also purports to tell the jury about "Telit's practice of booking [] these sales through its U.S. subsidiary, [indicating] the products are meant for [] a U.S. customer as a multinational company intending use outside of the U.S. would be able to place the order with a non-U.S. Telit entity."  (D.I. 202 at 12).  This line of argument essentially suggests that because the sales were booked through Telit's U.S. subsidiary, as opposed to one of its other foreign

subsidiaries, the Court should assume that all of the accused products purchased from Telit U.S.

but shipped abroad eventually made it to the U.S.  While it seems plausible that some accused

products did make it into the U.S. as part of finished products, it seems just as plausible that a

considerable amount of the products shipped abroad remained abroad.  Yet Plaintiff argues for

the inclusion in its damages calculation of all accused products shipped abroad, without offering

proof that a single product shipped abroad was ever imported to the U.S.  Under Plaintiff's line

of argument, any contract of sale entered into by a U.S. subsidiary where the parent company has

other foreign subsidiaries selling its products would automatically be considered a sale or offer to

sell in the United States, even if no products ever entered the United States.  Supreme Court

precedent is clear, however, that the presumption against extraterritoriality is not so easily

defeated.  *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010) ("But the

presumption against extraterritorial application [of federal law] would be a craven watchdog

indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case.");

*Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454–55 (2007) ("The presumption that United

States law governs domestically but does not rule the world applies with particular force in

patent law.").

     In the context of inducement claims, other district courts have likewise rejected the

argument that a mere likelihood or possibility that component parts manufactured and shipped

abroad will be imported to the United States is sufficient to sustain a claim for inducement.  *See,*

*e.g., Largan*, 86 F. Supp. 3d at 1118 ("[Defendant] does not have insight into [other companies']

supply chain after it sells its lenses to the module integrators, and has no idea whether its lenses

go into products sold in the United States. . . . [Therefore Defendant] lacked the requisite

'knowledge that the induced acts constitute patent infringement,' because the . . . end products

45

using its lenses could all be sold outside the United States, where they would not infringe . . . ."); *MeadWestvaco Corp. v. Rexam PLC*, 2012 U.S. District LEXIS 189304, at *95 (E.D. Va. Apr. 12, 2012) ("Nonetheless, it is possible that some pumps were sold to clients who may import their fragrance products containing these pumps into the United States. However, [Plaintiff] fails to present evidence establishing that such importation in fact took place.").[20]  These cases also reinforce the fact that it is Plaintiff's burden to prove that the accused products made it into the United States, for purposes of proving that anyone directly infringed.  Accordingly, without proof that some accused products shipped abroad were actually imported into the U.S., Plaintiff cannot rely on the mere possibility that some products made it into the U.S., especially when arguing to include all products shipped abroad in its damages calculation.

Fourth, Plaintiff purports to tell the jury about "Telit's own testimony that it relies on information from ABI Research to determine the number of Telit products actually entering the U.S." (D.I. 202 at 11).  Defendants respond that the ABI document was merely mentioned in a Telit PowerPoint slide, which references a 2011 estimate of the total North American market for similar products in the industry. (D.I. 242 at 2).  More importantly, however, Defendants point out that "[n]o expert or fact witness has ever testified about that ABI document (which is hearsay in any event) . . . ." (*Id.* at 2).  Without delving into the more extensive substantive criticisms

---

[20] While Plaintiff does not make a specific argument on this damages issue regarding the inducement standard in its briefing, Defendants separately argue that even if there were proof that products delivered abroad were ever imported into the U.S., they are "not liable for any importation of products by non-U.S. third parties, into the U.S." (D.I. 166 at 19).  Because "[i]n order to prevail on an inducement claim, the patentee must establish first that there has been direct infringement," I need not reach this argument because Plaintiff has presented no evidence that these products were actually imported into the US. *See ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007) (internal quotation marks omitted).  Without an underlying act of direct infringement with regard to this subset of products shipped abroad, Plaintiff cannot maintain an inducement claim.  *See id.*  In any event, as discussed in *Largan* and *MeadWestvaco* above, it seems unlikely that shipping a product to a contract manufacturer, without more evidence, establishes the requisite knowledge and specific intent for these products to be imported into the U.S. *See Largan*, 86 F. Supp. 3d at 1118 ("Cases denying summary judgment of no induced infringement for foreign sales have pointed to evidence, either direct or circumstantial, that showed the accused infringer likely knew and intended for its products to be used in the United States.").  Plaintiff has presented no such evidence here.

levied by Defendants against the reliability of using the ABI data here, I observe that Plaintiff has not actually stated how it would use the data to come to a reasonable estimate of how many products shipped abroad actually reach the United States. Plaintiff's reference to ABI data essentially amounts to a broad suggestion that it will come up with a damages theory using the ABI data by the time a trial comes around. In doing so, Plaintiff's references to ABI data do not establish that there exists a genuine issue of material fact, because it has not explained, aside from the broad assertion that ABI data exists concerning the overall market in North America, how it can use the ABI data to prove to a reasonable jury could how many accused products shipped abroad made it into the United States, if any.

At bottom, while Plaintiff describes the amount of such products eventually reaching the U.S. as a "classic factual dispute," it offers no evidence through which a jury could quantify, for purposes of calculating damages, how many of those products shipped abroad actually made it into the United States, if any. This failure of proof is highlighted by the fact that Plaintiff, and its expert Mr. Bero, employ an all-or-nothing approach. Rather than providing an estimate of how many of these products enter the U.S. based on some reasonable projection grounded in facts, Plaintiff seeks to include all products shipped abroad in its damages calculation without proving that a single product shipped abroad actually made into the U.S. As Supreme Court precedent makes clear, "[a]ny doubt regarding whether conduct falls outside the purview of United States patent law should be resolved by the presumption against extraterritoriality." *Lake Cherokee*, 964 F. Supp. 2d at 655–56 (citing *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). Accordingly, because Plaintiff has failed to offer a shred of evidence that a single product shipped abroad, let alone all of them, made it into the U.S., the presumption against the extraterritorial application of U.S. patent law must govern. I will therefore grant Defendants'

Motion for Summary Judgment of no infringement by products made and shipped outside of the U.S.

### 3.   No Infringement by PLC

Defendants argue that there is no legal justification to keep Telit Communications PLC ("PLC"), a foreign parent corporation of Telit Wireless Solutions, Inc. ("Telit U.S."), as a part of this lawsuit, because the crux of Plaintiff's reasoning for including PLC as a defendant is merely that "PLC is the 'ultimate parent' of its 'wholly owned subsidiary,' Telit US." (D.I. 166 at 22). More specifically, Defendants argue that "'substantial' or 'exceptional' reasons must exist to disregard the corporate form," and that Plaintiff, the party alleging PLC's liability, bears the burden of proof that there are such compelling reasons to do so.  (*Id.*).  Defendants further contend that to rely on veil piercing theories, Plaintiff must prove fraud or something like it, such as a lack of attention to corporate formalities or that the corporate parent exercises complete domination and control over its subsidiary, which Plaintiff does not even purport to allege here. (*Id.* at 22–23).  Accordingly, Defendants' principal argument is that, because there is no evidence that PLC sells, offers to sell, or imports any product to the United States, and because Plaintiff has not adequately alleged exceptional circumstances such that PLC should be held liable for the sales of its subsidiary, PLC cannot be held liable for contributory or induced infringement.  (*Id.* at 22–24).

While not so clearly presented, the Court perceives that Plaintiff is essentially asserting two arguments as to why PLC should remain part of the litigation.

First, Plaintiff argues that PLC should be held responsible for all of Telit U.S.'s sales, because "all of Defendants' activities operate under a single entity, that being Telit PLC." (D.I. 202 at 12).  Plaintiff cites several publicly available documents to support this contention,

including a 2014 Telit Wireless Solutions Company Fact Sheet (D.I. 205-4), a 2011 PLC Annual

Report (D.I. 205-6, 205-7), and various portions of the website Telit.com (D.I. 205-5, 205-8,

205-9, 205-10, 205-11, 205-12). (D.I. 202 at 12–14). In particular, Plaintiff emphasizes a

statement on the 2014 Fact Sheet that "'Telit Wireless Solutions is a brand of Telit

Communications PLC'" and the fact that the Telit website "bears a Telit Communications PLC

copyright stamp, [and] provides Telit Communications PLC corporate information as 'Telit'

information in its 'About Us' and 'FAQ' pages." (D.I 202 at 12, 15 (citing D.I. 205-4)). The

bulk of Plaintiff's remaining arguments essentially assume that because there is "little

distinction" in the cited materials and on the Telit website between PLC and Telit U.S., any and

all statements generally referring to "Telit" on both mediums are attributable to the PLC parent

corporation. (*Id.* at 12–14). Plaintiff's argument is best summarized by its own statement that,

"[a]s M2M Solutions contends that Telit PLC has total control over Telit Inc., M2M Solutions is

seeking to hold Telit PLC liable for Telit Inc.'s sales." (*Id.* at 16). Accordingly, although

Plaintiff does not cite any legal authority nor make any true legal arguments that the Court

should ignore corporate formalities, I will assume for purposes of argument that this is what

Plaintiff's briefing is attempting to suggest.

Second, Plaintiff separately argues, albeit briefly, that PLC is directly "liable for

inducement by providing customer support, service, and technical documents teaching U.S.

customers how to infringe." (*Id.*). The underlying evidence that Plaintiffs cite to support the

allegation of PLC's inducement, however, relies on the assumption that the Telit website is

solely PLC's website, because Plaintiff begins repeatedly referring to the Telit website

exclusively as "Telit PLC's website." (D.I. 202 at 13–14). In this vein, Plaintiff argues that

Telit.com provides "access to a support forum, access to technical training videos, offers for

product technical support, and offers for services technical support," along with "readily available technical literature." (*Id.* at 13–16).

Defendants respond by pointing to the testimony of PLC's Senior Vice President, who explains that PLC does not author any technical documents, distribute any technical documents or products to the U.S., or provide any technical support to persons in the U.S. (D.I. 166 at 13 (citing D.I. 167-1 at 4, ¶¶ 7–11)). Further, Defendants argue that the Telit website is not owned and operated by PLC, and that even if it were, that the summarized information presented on a company's website does not alter its corporate structures. (D.I. 226 at 11). Finally, Defendants argue that even if the Telit website were attributable to PLC, Plaintiff's vague allegations of PLC's technical support and marketing activities, based on information provided on its website, are not sufficient to prove inducement. (D.I. 166 at 21; D.I. 226 at 11).

The Federal Circuit recently cautioned that district courts should be careful not to conflate the issue of derivative liability for the act of another entity, such as a subsidiary, with arguments that a parent corporation is directly liable for inducement. *See Astornet Techs., Inc. v. BAE Sys., Inc.*, 802 F.2d 1271, 1278–80 (Fed. Cir. 2015). The Court explained that, "without regard to veil piercing, [Defendant] could be directly liable for its own wrongful acts of inducement . . . . [T]he issue is whether the defendant's own conduct meets the standards for inducement, including the requirements for inducing acts with the requisite intent." *Id.* at 1279. Accordingly, I will separately consider both a) whether PLC can be held liable for contributory infringement under an alter ego theory based on the sales of its U.S. subsidiary, and b) whether PLC can be held directly liable for inducement under § 271(b).

50

### a.  Contributory Infringement

"Under ordinary circumstances, a parent corporation will not be held liable for the obligations of its subsidiary.  Limited liability is the general rule, not the exception." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 270 (D. Del. 1989) (citation omitted); *see also U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." (internal quotation marks omitted)).  "Disregard of the corporate entity is appropriate only in exceptional circumstances.  Since it is the exceptional instance where a court will disregard the corporate form, the party who wishes the court to disregard that form bears the burden of proving that there are substantial reasons for doing so." *Mobil Oil*, 718 F. Supp. at 270 (citations and internal quotation marks omitted).  If such exceptional circumstances are proven in a patent case, "[a] parent corporation that directs the allegedly infringing activity of a subsidiary can be liable for its subsidiary's infringement." *Intellectual Ventures I LLC v. Toshiba Corp.*, 66 F. Supp. 3d 495, 498 (D. Del. 2014).

Different terminology is often used "in considering whether a parent corporation will be held liable for the actions of its subsidiary . . . . 'alter ego theory' is often used interchangeably with such expressions as 'disregarding the corporate entity' and 'piercing the corporate veil.'"[21] *Mobil Oil*, 718 F. Supp. at 266.  This court has previously explained in a patent case that:

> [R]egardless of the precise nomenclature employed, the contours of the theory are the same.  A subsidiary corporation may be deemed the alter ego of its corporate parent where there is a lack of attention to corporate formalities, such as where the assets of two entities are commingled, and their operations intertwined.  An alter

---

[21] For the sake of clarity, I will refer to these arguments generally as Plaintiff's "alter ego theory" throughout the remainder of this opinion.

> ego relationship might also lie where a corporate parent exercises complete
> domination and control over its subsidiary.

*Id.* When proceeding against a parent corporation under such a theory in a patent infringement

action, "[s]imply being a wholly-owned subsidiary of a parent corporation alone does not make

the subsidiary the agent of its parent; rather, a parent corporation will be held liable for the

activities of the subsidiary only if the parent dominates those activities." *Intellectual Ventures I*,

66 F. Supp. 3d at 498 (internal quotation marks omitted).

It is clear to the Court that Plaintiff's contributory infringement claim against PLC

depends entirely on its alter ego argument, and Plaintiff seems to concede as much. (D.I. 202 at

17 (arguing that "the same knowledge Telit Inc. had applies to Telit PLC" and "Defendants'

products sales in the United States, and therefore liability for contributory infringement, should

be attributed to Telit PLC.")).  Plaintiff has made no argument nor pointed to any evidence of

record, to suggest that PLC independently "offers to sell or sells within the United States, or

imports into the United States" any products or components at all, as required to prove

contributory infringement. *See* 35 U.S.C. § 271(c).  Accordingly, the only way a contributory

infringement action against PLC could survive would be if Plaintiff adequately proved that PLC

should be held liable for Telit U.S.'s sales as a parent corporation under its alter ego theory.

With regard to its blanket suggestion that all of Telit U.S.'s sales should also be

attributable to PLC, Plaintiff does not point to any evidence suggesting a lack of attention to

corporate formalities between PLC and Telit U.S. or that PLC otherwise exercises complete

domination or control over Telit U.S. *See Intellectual Ventures I*, 66 F. Supp. 3d at 498; *Mobil

Oil*, 718 F. Supp. at 266.  In fact, Plaintiff does not even suggest that PLC directly plays any role

in the sales efforts or importation of the allegedly infringing products, aside from the bare

assertion that it is the ultimate parent of Telit U.S.  The general informational statements Plaintiff

points to from the Telit website,[22] regarding branding and suggestions that Telit is a single entity, do not come close to establishing the exceptional circumstances required for this Court to disregard the separate corporate form between PLC and Telit U.S.[23]  Because Plaintiff has failed to adduce reliable evidence, let alone evidence sufficient to meet its burden of proving that exceptional reasons exist for this Court to disregard PLC's separate corporate form, the sales of Telit U.S. should not be attributed to its parent corporation, PLC. *See Mobil Oil*, 718 F. Supp. at 270.  Accordingly, Plaintiff's claim for contributory infringement against PLC is unsustainable as a matter of law.

### b. Inducement[24]

The only evidence that Plaintiff presents to support its contention that PLC directly induces infringement is that Telit's website provides "technical documents" as well as "access to a support forum, access to technical training videos, offers for product technical support, and offers for services technical support." (D.I. 202 at 14).  The rest of Plaintiff's purportedly separate inducement arguments revert back to the same alter ego arguments that the Court has already found insufficient with regard to contributory infringement.  (*Id.* at 12–16).  In fact, Plaintiff's inducement argument relies entirely on the assumption that the Telit website is owned and operated by PLC, which Plaintiff bases on a PLC copyright stamp and the inclusion of PLC

---

[22] Plaintiff also has not offered evidence sufficient that a jury could find that the Telit website should be attributed to PLC.

[23] This Court has repeatedly rejected the use of informational websites or brochures as a means of establishing that a parent corporation is using a subsidiary as its alter ego.  *See, e.g., Intellectual Ventures I LLC v. Nikon Corp.*, 935 F. Supp. 2d 787, 795 n.5 (D. Del. 2013) ("Maintenance of an informational website does not pass muster for the required showing of control or direction."); *Freres v. SPI Pharma, Inc.*, 629 F. Supp. 2d 374, 385 (D. Del. 2009) (holding that "[t]he mere fact that Anhydro Holding commented on its website that its regional sales companies were now part of the Anhydro family" and "became part of one single entity known as Anhydro," "is not evidence of the [alter ego] relationship necessary for personal jurisdiction."); *Japan Petroleum Co. (Nigeria) v. Ashland Oil, Inc.*, 456 F. Supp. 831, 846 (D. Del. 1978) (cautioning against reliance on parent company's annual report because its "representations may result from public relations motives or an attempt at simplification").

[24] For a recitation of the legal standard pertaining to a claim of inducement under 35 U.S.C. § 271(b), see Part III.A.4.b of this opinion.

corporate information on the website.  (*Id.* at 15).  I am mindful however, that "[m]aintenance of

an informational website does not pass muster for the required showing of control or direction."

*Intellectual Ventures I LLC v. Nikon Corp.*, 935 F. Supp. 2d 787, 795 n.5 (D. Del. 2013); *see*

*also supra* note 23.

Defendants, on the other hand, provided actual evidence, in the form of a domain name

registration page, that the Telit website is not owned and operated by PLC, but rather by Telit

Communications S.p.A., an Italian company.  (D.I. 227-1 at 36, 41).  Moreover, Defendants also

provided a sworn statement from PLC's Senior Vice President, Yariv Dafna, stating that PLC

does not author any technical documents, distribute any technical documents or products to the

U.S., or provide any technical support to persons in the U.S.  (D.I 167-1 at 4, ¶¶ 7–11).

Accordingly, even if all the statements and technical support provided on the Telit website were

sufficient to establish inducement, it is undisputed factually—as all that Plaintiff presents to the

contrary is mere attorney argument—that the Telit website is not attributable to PLC.

Even if I were to accept for purposes of argument that all the materials on the Telit

website are attributable to PLC, Plaintiff does not present adequate evidence for the Court to

discern how PLC engaged in "culpable conduct, directed to encouraging another's

infringement."  *See DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en

banc).  Plaintiff's theory of infringement is that the accused products do not infringe as sold, but

once they are connected to an antenna they meet all the relevant claim limitations.  Under this

theory, in order to demonstrate facts suggesting "an affirmative act to encourage infringement,"

Plaintiff would have to point to specific evidence of literature directing the user to hook its

product up to an antenna, which would then make its products infringing devices.  *See Info-Hold,*

*Inc. v. Muzak LLC,* 783 F.3d 1365, 1372 (Fed. Cir. 2015).  While Plaintiff provides general

citations to three portions of the Telit website with product descriptions and links to various user

guides (D.I. 202 at 14 (citing D.I. 205-10, 205-11, 205-12)), Plaintiff fails to include the actual

user guides in the record, fails to cite specific portions of any of the numerous user guides, and

does not adequately explain how any single piece of literature on the Telit website demonstrates

to users how to use its products to infringe under its current theory.  Plaintiff's general references

to the existence of technical literature, a support forum, and technical support on the Telit

website, therefore do not create genuine issues of material fact as to PLC's inducement.  The

mere possibility that documents teaching users to infringe exist among the large multitude of

documents available on the Telit website is immaterial because Plaintiff has failed to meet its

burden of showing that a fact is genuinely disputed by "citing to particular parts of materials in

the record."[25]  *See* FED. R. CIV. P. 56(c)(1)(A).  As a result, Plaintiff's assertion that PLC

provides "technical documents teaching U.S. customers how to infringe" is merely attorney

argument, insufficient to create a factual dispute to survive summary judgment.  (D.I. 202 at 16).

After the close of discovery, the fact that Plaintiffs are relying solely on stray statements

on the Telit website and annual reports to justify PLC's continued presence in this lawsuit is

telling.  Because Plaintiff has presented insufficient record facts to support its contributory

infringement and inducement claims against PLC, Defendant PLC is entitled to judgment as a

matter of law of non-infringement.

---

[25] In this key respect, Plaintiff's arguments to keep PLC as a defendant differ from its general inducement arguments.  Plaintiff supported its general inducement claim through the expert report of Dr. Nettleton.  Dr. Nettleton opined, citing specific documents produced in discovery, that Telit provided instructions to end users directing them to connect an accused product's solder pad to an antenna.  (D.I. 199-1 at 15, ¶41).  Dr. Nettleton did not, however, purport to differentiate between Telit entities in his analysis.  He simply referred generally to "Telit."  (*Id.*).  In fact, Plaintiff does not rely on any opinions of Dr. Nettleton in its briefing regarding the viability of its claims against PLC. (D.I. 202 at 12–18).  Regarding this PLC issue, Plaintiff did not include actual user guides in the record or otherwise point the Court to one example of a document on the Telit website instructing users to connect the accused products to an antenna.  Therefore, unlike with its general inducement claim, Plaintiff fails to provide the sort of detailed support for its broad statement that the Telit website teaches users to infringe and, accordingly, does not meet its burden of showing a disputed issue of material fact as to inducement by PLC via the Telit website.

## IV.    CONCLUSION

For the reasons set forth above, the Court will grant Defendants' Motion for Summary

Judgment Related to Damages (D.I. 165) in its entirety, and will deny Defendants' Motion for

Summary Judgment of Invalidity (D.I. 171) and Motion for Summary Judgment of Non-

Infringement (D.I. 175) in their entirety.  A separate order, consistent with this Memorandum

Opinion, will be entered.