IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

M2M SOLUTIONS LLC,

    Plaintiff,

v.

MOTOROLA SOLUTIONS, INC., TELIT
COMMUNICATIONS PLC, and TELIT
WIRELESS SOLUTIONS INC.,

    Defendants.

Civil Action No. 12-33-RGA

MEMORANDUM OPINION

Richard D. Kirk, Esq., Stephen B. Brauerman, Esq., Vanessa R. Tiradentes, Esq., Sara E. Bussiere, Esq., BAYARD, P.A., Wilmington, DE; Marc N. Henschke, Esq., FOLEY & LARDNER LLP, Boston, MA, Jeffrey N. Costakos, Esq. (argued), Kadie Jelenchick, Esq., FOLEY & LARDNER LLP, Milwaukee, WI, Jason J. Keener, Esq. (argued), Jeffrey J. Mikrut, Esq., FOLEY & LARDNER LLP, Chicago, IL.

Attorneys for Plaintiff M2M Solutions LLC.

Jack B. Blumenfeld, Esq., Rodger D. Smith II, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; David Loewenstein, Esq. (argued), Clyde A. Shuman, Esq., Guy Yonay, Esq., PEARL COHEN ZEDEK LATZER, New York, NY.

Attorneys for Defendant Telit Wireless Solutions Inc.

February 25, 2016

*/s/ Richard G. Andrews*
**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court are two *Daubert* motions: Defendant's Motion to Exclude the Testimony of M2M's Damages Experts Herman "Whitey" Bluestein and Richard Bero (D.I. 168), and Plaintiff's Motion to Exclude Opinions of [Charles] Donohoe (D.I. 174). The parties argued these motions with their motions for summary judgment during oral argument on October 30, 2015. (D.I. 245). The Court subsequently held a *Daubert* hearing on January 6–7, 2016. (D.I. 250). For the reasons that follow, the Court will grant both motions to exclude.

## I. BACKGROUND

On January 13, 2012, Plaintiff M2M Solutions LLC filed five related patent infringement actions asserting infringement of U.S. Patent Nos. 8,094,010 ("the '010 patent") and 7,583,197 ("the '197 patent"). (D.I. 1). After this Court invalidated the '197 patent (D.I. 94), entered final judgment in favor of Defendant Motorola Solutions, Inc. by granting a stipulation (D.I. 158), and granted summary judgment of non-infringement as to Defendant Telit Communications PLC (D.I. 247), all that remains is Plaintiff's claim against Telit Wireless Solutions Inc. for infringement of the '010 patent. The '010 patent claims a "programmable communicator device" that is capable of receiving transmissions, authenticating them using a particular form of coded number authentication, and storing numbers from authenticated transmissions in a list of permitted callers. ('010 patent, abstract & claim 1). The patent further contemplates a device that is remotely programmable and that allows for remote data monitoring, "which can be used to relay information about the status of a remote piece of technical equipment such as a vending machine." (*Id.* col. 3, ll. 43–47; *id.* col. 4, ll. 3–7; *id.* col. 7, ll. 24–30).

In these two motions, the parties do not lay out in any real detail what exactly the accused products do. In the briefing on the parties' summary judgment motions, it is suggested that the

accused products have multiple "modes" of operation, only two of which are accused of infringing. (D.I. 177 at 11; D.I. 198 at 11–12 (citing D.I. 199-1 at 20–24, ¶¶ 55–63)). Based on this background, it appears that a significant part of Mr. Bluestein's analysis here aims to approximate how many users of the accused modules actually use the modes or features of these modules that constitute the infringing technology. (D.I. 201-1 at 21–23). It is necessary for him to do so, because the degree of importance of the accused technology will have a significant impact on a reasonable royalty analysis.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

2

> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote and internal citations omitted).[1]

The party offering expert testimony bears the burden of proving its admissibility by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharm., Inc*, 509 U.S. 579, 592 n.10 (1993). In the context of calculating a reasonably royalty in a patent case under 35 U.S.C. § 284, the Federal Circuit has explained that "damages awarded for patent infringement must reflect the value attributable to the infringing features of the product, and no more." *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (internal quotation marks omitted). "[G]iven the great financial incentive parties have to exploit the inherent imprecision in patent valuation, courts must be proactive to ensure that the testimony presented—using whatever methodology—is sufficiently reliable to support a damages award." *Id.* Further, the Federal Circuit has "consistently explained that proof of damages must be carefully tied to the claimed invention itself." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1324 (Fed. Cir. 2014); *see also VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014) ("[T]his court has consistently held that a reasonable royalty analysis requires a court to . . . carefully tie proof of damages to the claimed invention's footprint in the market place." (alteration in original) (internal quotation marks omitted)). "While questions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury, a critical prerequisite is that the

---

[1] The Court of Appeals wrote under an earlier version of Rule 702, but later amendments to it were not intended to make any substantive change.

3

underlying methodology be sound." *VirnetX*, 767 F.3d at 1328. "[T]he essential requirement for reliability under *Daubert* is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *CSIRO*, 809 F.3d at 1301 (internal quotation marks omitted).

## III. DISCUSSION

### A. Defendant's Motion to Exclude Opinions of Mr. Bluestein and Mr. Bero

As it relates to Mr. Bero, Defendant's motion principally concerns his reliance on the underlying substantive opinions of Mr. Bluestein. Accordingly, I begin by analyzing the opinion of Mr. Bluestein. The crux of Defendant's argument is that Mr. Bluestein is not an expert in the relevant technology and that his expert report relies on surveys ("the Beacham Reports") that are not sufficiently related to the patented technology. (D.I. 169 at 5–6). Defendant points out that the central conclusion of Mr. Bluestein's expert report is that survey respondents in the Beacham Reports who said they use "internal resources" to manage their M2M devices are using the patented technology. (*Id.* at 9–10). Defendant argues that the Beacham Reports do not discuss M2M device technology at all, but instead relate to the market for services platforms that manage a company's M2M technology, known as Service Enablement Services ("SE Services"). (*Id.* at 14). Thus, Defendant contends, there is no connection between using "internal resources" to manage M2M technology and the technology claimed in the '010 patent, aside from Mr. Bluestein's unsupported word linking the two. (*Id.* at 11). Defendant asserts that the technical links crucial to Plaintiff's damages theory—such as the idea that the patented technology appeals to customers who value "security" and that there is a connection between the use of internal resources and the patented technology—are solely provided by Mr. Bluestein, who admits to not being a technical expert. (*Id.* at 12). Accordingly, Defendant argues, Mr. Bluestein failed to

4

adequately tie his damages theory to the claimed subject matter of the '010 patent, as Federal Circuit precedent requires. (*Id.*).

Plaintiff describes Mr. Bluestein as "a machine to machine ('M2M') industry market expert" and describes his expert report as "mak[ing] a reasonable approximation of the importance of the patented technology to Telit's customers based on his own experience, as well as well regarded . . . industry reports and surveys." (D.I. 200 at 4). Plaintiff argues that the two important opinions Mr. Bluestein provides regarding the M2M industry are that "the asserted patented technology provides a number of important advantages to an end-user of M2M modules" and "maintains significant advantages over the next closest alternative, a dedicated cloud-based platform." (*Id.* at 6). Plaintiff further asserts that, while the Beacham Reports do not concern M2M devices, Mr. Bluestein appropriately connects the reports with the '010 patent because of the advantageous security features of the patented technology and the "almost universal interest in security for the M2M modules." (*Id.* at 7). Plaintiff summarizes its argument in favor of Mr. Bluestein's methodology as follows: "The Beacham Reports are used to approximate the number of people who buy the accused intelligent M2M modules from Telit who rely on the internal security provided by the patented technology versus the number of people who buy the accused intelligent M2M modules from Telit yet rely on the next best alternative of an external cloud-based platform to provide security." (*Id.*)

I conclude that Mr. Bluestein's testimony must be excluded for three principal reasons: 1) I do not think that Mr. Bluestein is qualified as an expert to render technical conclusions about the advantageous characteristics of the patented technology, 2) the Beacham Reports are completely unrelated to M2M device technology and any allegedly infringing features of the

5

accused products, and 3) the only link between the Beacham Reports and the patented technology is provided solely by Mr. Bluestein's say-so.

First, I do not think that Mr. Bluestein is qualified as an expert in M2M device technology, security features, or industry surveys. Plaintiff describes Mr. Bluestein as "an expert in the M2M industry with more than 30 years in telecommunications, with a focus on mobile services, virtual mobile operators, and M2M technology." (D.I. 200 at 5). Plaintiff points out that Mr. Bluestein has authored and been quoted by industry publications, has appeared as an industry expert on TV and in various speaking engagements, and consults with young and established companies regarding corporate strategy and development. (*Id.*). Yet Mr. Bluestein admitted that none of his articles, TV appearances, and speaking engagements were related to the type of M2M device covered by the '010 patent. (D.I. 250 at 128).

While Plaintiff characterizes Mr. Bluestein's testimony as "regarding the M2M industry," the important opinions he provides are technical conclusions about the security benefits provided by the patented technology and security features of other M2M products on the market. Even Plaintiff's own characterization of the importance of Mr. Bluestein's testimony is telling:

> Mr. Bluestein gives two main opinions regarding the M2M industry. First, Mr. Bluestein opines that the asserted patented technology provides a number of important advantages to an end-user of M2M modules, especially over the alternatives present in the market. Second, Mr. Bluestein opines that the asserted patented technology maintains significant advantages over the next closest alternative, a dedicated cloud-based platform.

(D.I. 200 at 6 (citation and footnote omitted)). When prompted by the Court to clarify the scope of Mr. Bluestein's expertise (D.I. 250 at 264), Plaintiff broadly declared that he is an expert in essentially everything about which he testified:

> For purposes of his opinions in this case, Mr. Bluestein's expertise is primarily directed to understanding the importance of security features to M2M customers, M2M customer preferences for handling security either with internal resources (and

6

what that entails) or an external SES provider, the commercial and customer advantages of a built-in security feature versus other potential security features, and understanding and interpreting industry reports such as the Beacham Research Studies.

(D.I. 256 at 4 (citations omitted)). Despite repeatedly stating that he is not a "technical expert" (D.I. 201-1 at 10; D.I. 250 at 127) or a "patent expert" (D.I. 250 at 174), Mr. Bluestein purports to offer important opinions about the technical, security-related advantages of the invention claimed in the '010 patent. (D.I. 201-1 at 11–20). Mr. Bluestein's conclusions regarding the patented technology are sweeping, but his vague reasoning and lack of explanation demonstrate little more than a rudimentary understanding of the invention that the '010 patent claims. More specifically, his descriptions of the '010 patent are limited to broad statements: that it describes a device having built-in security features, that alternative products in the market do not, and that security is a major concern in the M2M industry. (*Id.*; D.I. 250 at 110–13, 115–16, 200–01). In other words, while Mr. Bluestein may have considerable experience in the industry generally, he does not have the expertise (and he does not rely on others who do) to carefully tie his methodology (or, indeed, any methodology) to the '010 patent's footprint in the marketplace, especially when only providing vague platitudes about what that footprint is. *See VirnetX*, 767 F.3d at 1327; *Apple*, 757 F.3d at 1324.

Second, I do not think that the Beacham Reports are a reliable way of determining end-user preferences with regard to M2M device technology generally and the '010 patent's narrower technology specifically. The '010 patent claims a "programmable communicator device" that that is capable of receiving transmissions, authenticating them using a particular form of coded number authentication, and storing numbers from authenticated transmissions in a list of permitted callers. ('010 patent, abstract & claim 1). The Beacham Reports, however, relate to services platforms within the M2M industry—Service Enablement Services ("SE Services")—

7

rather than the market for M2M devices. (*See, e.g.*, D.I. 201-5 at 31 (concluding that those in the M2M industry are "recogniz[ing] more clearly the need for SE service capabilities to support their connected device designs.")).[2] Plaintiff argues that this does not matter, because "SES services are used to implement and monitor M2M devices, [and they] thus provide relevant information [as] to whether a customer would be using the built-in internal security measures of the M2M module or the external resources of a cloud-based platform to provide security to the module." (D.I. 200 at 13). I find Plaintiff's explanation of this methodology unconvincing.

The Beacham Reports do not discuss M2M device technology at all, let alone provide any sort of discussion about particular security features of M2M devices. (D.I. 250 at 135). Likewise, neither the claims nor the specification of the '010 patent mentions SE Services or otherwise suggests that an advantage of the patented technology is that it allows users to operate their devices without employing outside service providers. The only connection Mr. Bluestein makes between this device patent and SE Services is his conclusion that a dedicated cloud-based platform—which he equates with using SE Services—is the "next-best alternative" to the patented technology. (D.I. 201-1 at 21–22). However, Mr. Bluestein's conclusion that the next-best alternative to the patented technology is a dedicated cloud-based platform is seemingly plucked out of thin air. (D.I. 201-1 at 21; D.I. 250 at 176). This conclusion requires a level of technical expertise that an admittedly non-technical expert would not have. Simply put, the Beacham Reports' subject matter and conclusions do little to answer—and are quite far afield from—the question of how many users of the accused devices actually use the patented

---

[2] The Beacham Reports define "the Service Enablement Services (SES) layer for M2M as the layer above network connectivity—such as mobile airtime—and the layer below end user services—such as fleet/freight management and security alarm services." (D.I. 201-2 at 6). Examples of such services include "Remote enable/disable and auto-provisioning [,] Managed update of remote devices with the latest application software [,] Data warehousing of device data prior to processing by end user applications[,] [and] Integration with enterprise systems." (*Id.*).

8

technology. Accordingly, Mr. Bluestein's conclusions, which rely entirely on the Beacham Reports, are certainly not "carefully tied to the claimed invention itself." *Apple*, 757 F.3d at 1324; *see also Fractus, S.A. v. Samsung*, 2011 WL 7563820, at *1 (E.D. Tex. Apr. 29, 2011) ("[T]he surveys are not tied to the alleged advantageous technical characteristics of the patents-in-suit. . . . Allowing the jury to hear such evidence not tied to the claimed invention risks compensation for infringement [that] punishes beyond the reach of the statute." (second alteration in original) (citations and internal quotation marks omitted)).

Third, the linchpin of Mr. Bluestein's damages theory—that Beacham Report survey respondents who indicated a preference for using internal resources to manage their M2M products use the patented technology—is unsupported by anything other than Mr. Bluestein's say-so. (D.I. 201-1 at 21–23; D.I. 250 at 164, 200). Indeed, Mr. Bluestein expressly admitted that his opinion provides the only link between the concept of internal resources and the patented technology. (D.I. 250 at 164). Mr. Bluestein broadly declares that survey respondents who prefer to manage their M2M technology in-house—in other words, they prefer to use their own employees and resources versus contracting out for these services—are likely to use the invention claimed by the '010 patent.[3] He establishes this connection by opining that the device claimed in the '010 patent and the use of internal resources to manage M2M technology are connected by a common notion: a concern for "security." (D.I. 201-1 at 21–23; D.I. 250 at 110–13; D.I. 250 at 200 ("If security is important to you, and you want to use internal resources, then those are the kind of people that are going to gravitate to [the patented] product.")).

---

[3] In his expert report, Mr. Bluestein subtly equates the use of internal resources with using the patented technology, with little explanation for why he does so:
> [A] rough estimation would be that about 37.8% of the respondents to Figure 17 were both *using internal resources* for SES and were product manufacturers or end-users. Thus, as a rough proxy, this study would indicate that at least 37.8% of customers *use the patented technology* to wirelessly remotely program their M2M products instead of some sort of dedicated cloud-based platform.

(D.I. 201-1 at 23 (emphases added)).

9

The Beacham Reports, however, are not related to M2M device technology or device security features. The survey question in the Beacham Reports that Mr. Bluestein relies upon to calculate how many respondents use internal resources makes no mention of "security" at all and is completely unrelated to M2M device technology. (D.I. 201-4 at 31). Figure 16, which Mr. Bluestein relies upon (D.I. 201-1 at 22), "shows responses to the question 'Who is providing Service Activation, Status Monitoring, and Remote Management Activities for these Connected Products/Services Once in Service?'" (D.I. 201-4 at 31). Plaintiff, however, repeatedly attempts to characterize this question as addressing whether a customer uses "internal resources for handling security," when in reality the question was directed to services generally, and makes no mention of security. (D.I. 250 at 110, 115). These shared "security" concerns are simply an unreliable construct Mr. Bluestein employs to validate his use of a survey that does not otherwise relate to the '010 patent's invention.

Despite admitting that he is not a technical expert (D.I. 201-1 at 10), Mr. Bluestein purports to provide the missing link between two seemingly unrelated subjects with testimony that requires and implies a quintessentially technical understanding of the invention claimed by the '010 patent. (*See, e.g.*, D.I. 201-1 at 21–22 ("[A] fundamental difference between an intelligent M2M module using the patented technology and an M2M module that is remotely programmable using a dedicated cloud-based platform, is based on the security features enabled by the patented technology.")). Yet Mr. Bluestein's descriptions of the patented technology remain exceedingly general. Perhaps most importantly, he provides no explanation of how the device claimed in the '010 patent eliminates the need to contract out for the broad swath of services that are referenced in the relevant survey question: "Service Activation, Status Monitoring, and Remote Management Activities for These Connected Products/Services Once in

Service." (D.I. 201-4 at 31). Such an explanation is critical, as the entire Bluestein/Bero damages theory stems from the purported cost savings of using the patented technology, because it allows users to avoid paying recurring monthly fees for SE Services. The notion that the '010 patent truly obviates any need or inclination to use SE services strikes me as implausible on its face and finds support only in the bald conclusions of Mr. Bluestein.

In sum, Plaintiff asks this Court to allow it to present damages testimony to the jury, whereby a non-technical expert extrapolates from a survey unrelated to the patented invention to calculate how many customers use the patented features of the accused products. Plaintiff certainly has not proven that Mr. Bluestein's underlying methodology is sound or reliable. *See VirnetX*, 767 F.3d at 1328. Instead, Mr. Bluestein presents "evidence unrelated to the claimed invention [that] does not support compensation for infringement but punishes beyond the reach of [35 U.S.C. § 284]." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). Given Mr. Bluestein's lack of technical expertise, his conclusion that he can use the Beacham Reports to reliably estimate how many Telit customers use the patented technology does not stand up to scrutiny.[4] *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." (internal quotation marks omitted)). For the reasons discussed above, the "trilogy of restrictions on expert testimony: qualification, reliability, and fit," all weigh considerably against the admission of Mr.

---

[4] Reading through the Beacham Reports only further convinces me that the Reports—and Mr. Bluestein's opinions relying on them—are not carefully tied to the claimed invention. *See VirnetX*, 767 F.3d at 1327; *Apple*, 757 F.3d at 1324. The overarching theme of both the 2010 and 2011 Beacham Reports is that the SE Services industry is poised for major growth because adopters "recognize more clearly the need for SE service capabilities to support their connected device designs." (D.I. 201-4 at 10). Discussions of security within the Reports are sparse and provide little or no basis to wield the concept of security in the manner that Mr. Bluestein does.

11

Bluestein's testimony. *See Schneider*, 320 F.3d at 404. Accordingly, Mr. Bluestein's opinion must be excluded under Rule 702.

With regard to Mr. Bero, Defendant argues that he relies solely on the unreliable substantive opinions of Mr. Bluestein for critical substantive matters underlying his opinions. (D.I. 169 at 9). Indeed, in his expert report, in order to assess how many customers use the patented technology, Mr. Bero relies entirely on the Beacham Reports and Mr. Bluestein's interpretation of those reports. (D.I. 201-6 at 17–19). At the *Daubert* hearing, Mr. Bero likewise admitted that he relies entirely on Mr. Bluestein's conclusion that use of internal resources can be equated with use of the patented technology. (D.I. 250 at 61–66, 70). Mr. Bero takes the 22% to 37.8% of users that Mr. Bluestein estimates use the patented technology, and multiplies those amounts with recurring monthly Average Revenue Per Unit ("ARPU") for two security-related categories of SE Services[5] listed in the 2010 Beacham Report, in order to calculate an apportioned value per month that each patented device provides. (D.I. 201-6 at 17–19). In simpler terminology, Mr. Bero uses monthly revenue earned for ongoing *services* to calculate a reasonable royalty for each single sale of an accused *device*, based upon the idea that parties will not have to shoulder the costs for SE services if they employ the patented technology. After calculating a per month value of the security component of each patented device, he extends that cost over the average useful life of an M2M module, goes through the *Georgia-Pacific* factors, and calculates a final reasonable royalty of $1.75 per accused product. (D.I. 201-6 at 28–34).

---

[5] The two broadly-defined categories from which Mr. Bero pulls the ARPU numbers for SE Services platforms are "Authorisation/Access Control" and "Device Data Security." (D.I. 201-6 at 17). The Beacham Reports define "Authorisation/Access Control" as "security of access to devices and information," and "Device Data Security," as "security of data from remote devices." (D.I. 201-2 at 10). The Beacham Reports provide little further detail as to which types of security features are contemplated by these service groups, making Mr. Bluestein's conclusion that they relate to the '010 patent's technology speculative.

12

Mr. Bero's opinion, which equates survey results regarding SE services with use of the '010 patent's technology, based solely upon the unsupported opinion of Mr. Bluestein, has not carefully tied proof of damages to the claimed invention. *See VirnetX*, 767 F.3d at 1327; *Apple*, 757 F.3d at 1324. Mr. Bero is simply the numbers guy here. He takes Mr. Bluestein's stamp of approval for the Beacham Reports and his underlying estimate of how many users employ the patented technology and makes more advanced calculations using additional figures from the Beacham Reports. Mr. Bluestein's opinion provides the foundation for Mr. Bero's reasonable royalty analysis. Without Mr. Bluestein's conclusions, that foundation crumbles. Accordingly, because I have concluded that the methodology Mr. Bluestein employs is unsound, requiring the exclusion of his testimony, Mr. Bero's damages testimony must be excluded as well.

### B. Plaintiff's Motion to Exclude Opinions of Mr. Donohoe

Plaintiff moves to exclude Mr. Donohoe's opinions on a running royalty rate for relying upon non-comparable license agreements.[6] In assessing the second *Georgia-Pacific* factor, Mr. Donohoe relies upon two licenses. (D.I. 204-1 at 35–37, ¶¶ 117–124). He first relies on a license between Telit and Company A[7] for a worldwide, standard-essential portfolio of patents covering CDMA modem card technology. (D.I. 204-1 at 35, ¶ 118). Mr. Donohoe notes that the technologies covered are "slightly different" from the technology of the asserted patent, but concludes that accused products are covered under the Company A license. (*Id.*). Mr. Donohoe also relies upon a license between Telit and Company B for a worldwide "portfolio of [Company B] GSM and GPRS standard-essential patents relating to all Telit products that are compliant with GSM and GPRS standards." (*Id.* at 36, ¶ 121). Mr. Donohoe concludes that the license

---

[6] Plaintiff does not seek to exclude Mr. Donohoe's testimony with regard to a lump sum reasonable royalty, only his opinion with regard to a running royalty rate. (D.I. 176 at 4 n.1).
[7] In order to avoid legitimate issues about third-party confidentiality, the pseudonyms "Company A" and "Company B" are used, and the "Agreed Percentage" is substituted for the actual royalty rate with Company B.

13

"applies to some of the accused Telit products in this litigation" and that the "[Company B] patents are comparable in the sense that they are significantly more important than the '010 patent." (*Id.* at 36, ¶¶ 121–22). Using the [Company B] license, Mr. Donohoe ultimately concludes:

> All of this[] would lead the negotiators to understand that a license to the single '010 patent would be significantly less valuable than the [Company B] license. . . . A consideration of this factor by the hypothetical negotiators would lead to a conclusion that the royalty rate should be no greater than [the Agreed Percentage], with Telit's negotiator having a reasonable position that the rate should be significantly less than [the Agreed Percentage].

(*Id.* at 37, ¶¶ 123–24).

Plaintiff argues that Mr. Donohoe's running royalty analysis is improper because it is driven exclusively by his analysis of these two large, standard-essential portfolios of patents that are licensed on a FRAND (fair, reasonable, and non-discriminatory) basis. (D.I. 176 at 4). The crux of Plaintiff's argument is that Mr. Donohoe's opinion improperly relies on licenses that are drastically different, both economically and technologically, from the underlying hypothetical negotiation. (*Id.* at 4, 8–11). Defendant argues that Mr. Donohoe is not using these licenses to estimate a reasonable royalty, but instead only to set an appropriate upper limit to Plaintiff's damages claims. (D.I. 203 at 5). Defendant's theory is that the Company A and B licenses—because they concern large, worldwide portfolios of standard-essential patents—are economically comparable to the '010 patent in the sense that their value compared to a single asserted patent is much greater. (D.I. 203 at 8–10). Defendant argues that these FRAND licenses are technologically comparable because they both cover technology that is exploited by the patent-in-suit, CDMA and GSM/GPRS technology. (*Id.* at 11).

The second *Georgia-Pacific* factor looks at "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit." *Georgia-Pacific Corp. v. U.S. Plywood Corp.*,

14

318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). "This factor examines whether the licenses relied upon . . . in proving damages are sufficiently comparable to the hypothetical license at issue in suit." *Lucent Techs, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009). "[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011). It is improper to "rely on license agreements that were radically different from the hypothetical agreement under consideration to determine a reasonable royalty." *Id.* at 1316 (internal quotation marks omitted). "[C]omparisons of past patent licenses to the infringement must account for the technological and economic differences between them." *Worldtech Sys., Inc. v. Integrated Network Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (internal quotation marks omitted). "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *Laser Dynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). "The testimony of a damages expert in a patent suit who relies on non-comparable licenses in reaching his royalty rate should be excluded." *DataQuill Ltd. v. High Tech Computer Corp.*, 887 F. Supp. 2d 999, 1022 (S.D. Cal. 2011).

As the above Federal Circuit precedent makes clear, Defendant must show that the prior licenses Mr. Donohoe relies upon are actually comparable to the license that the parties would have negotiated for the '010 patent before introducing this evidence to the jury. Mr. Donohoe has failed to show how these two large, worldwide, standard-essential, FRAND patent portfolios are economically comparable to a license that the parties would have negotiated for a single asserted patent. *See Lucent*, 580 F.3d at 1328 ("[A] reasonable juror could only conclude that the IBM-Dell license agreement for multiple patents to broad, PC-related technologies is directed

15

to a vastly different situation than the hypothetical licensing scenario of the present case involving only one patent . . . ."); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 2011 WL 7563818, at *3 (E.D. Tex. Jan. 7, 2011) ("[W]here a license covers a portfolio of patents . . . Plaintiff must present evidence sufficient to allow the jury to weigh the economic value of the patented feature against the economic value of the features and services covered by the license agreement. It is not sufficient to state that both patents cover [similar] technology."). In *DataQuill*, the district court excluded expert testimony, in similar circumstances, for comparing the two patents-in-suit to "significant patent agreements" that were not economically comparable. *See id.* at 1021–25. Specifically, the district court reasoned:

> [W]hat is troubling about [the expert's] lack of economic analysis is that "the significant patent agreements" appear to be licenses between HTC and heavyweights in the telecommunications industry such as Qualcomm, Ericson, Nokia, Lucent and Motorola for entire portfolios of patents. For example, HTC has shown the Court that one of the "significant patent agreements" is a worldwide license between HTC and Motorola for hundreds of patents covering a broad range of inventions. The Motorola license appears to be "radically different from the hypothetical agreement under consideration," which in this case is a domestic license for two patents.

*DataQuill*, 887 F. Supp. 2d at 1023 (quoting *Lucent*, 580 F.3d at 1328) (citations omitted).

I agree with Judge Gonzalez's analysis in *DataQuill* and similarly conclude that Mr. Donohoe's opinion improperly relies on licenses that are not economically comparable to the '010 patent. The negotiations surrounding the Company A and Company B portfolio licenses were undoubtedly "radically different" than the hypothetical negotiation that would have occurred between the parties for a license to a single patent. *See Uniloc*, 632 F.3d at 1317. While Defendant suggests that Mr. Donohoe "analyzed in detail economic similarities and differences between the two preexisting and hypothetical licenses" (D.I. 254 at 5), the cited paragraphs of his report provide little more than broad conclusions that the Company A and

16

Company B licenses are surely worth more than a single U.S. Patent, which could easily be designed around. (D.I. 204-1 at 36 ¶¶ 127–28; *id.* at 39, ¶¶ 136–37; *id.* at 47, ¶ 174). Mr. Donohoe provides no opinion that even attempts to describe the value of the patented technology in any specificity, in order to compare the value of the '010 patent to these large patent portfolios. He simply makes the bare assertion that these standard-essential, FRAND portfolios should intuitively be worth far more than a single asserted patent.[8] The Federal Circuit has cautioned against assuming, without analyzing the specific technological contributions of each patent, that a standard-essential patent is more valuable than other patents simply because of its widespread adoption. *See CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1304 (Fed. Cir. 2015) ("[W]idespread adoption of standard essential technology is not entirely indicative of the added usefulness of an innovation . . . . [D]amages awards for SEPs must be premised on methodologies that attempt to capture the asserted patent's value resulting not from the value added by the standard's widespread adoption, but only from the technology's superiority."). Accordingly, Mr. Donohoe's failure to even attempt to reference the economic value of the patented technology in any specificity, or that of the standard-essential FRAND licenses he compares it to, renders his damages opinion fatally insufficient. *See Worldtech*, 609 F.3d at 1320.[9]

---

[8] This straightforward argument, without analysis of the patented technology, could be made in almost every case where a Defendant can find an important standard-essential patent portfolio in the same general area of technology as an asserted patent. Significantly, however, Defendant has not been able to cite a single case where a court allowed an expert to compare a large FRAND portfolio not containing the patent-in-suit to the patent-in-suit for purposes of calculating a reasonable royalty. I have little doubt that the reason for this lack of case law is that allowing opinion testimony so untethered to the specific patent-in-suit would flout Federal Circuit precedent requiring that proof of damages be carefully tied to the claimed invention. *See VirnetX*, 767 F.3d at 1327; *Apple*, 757 F.3d at 1324.

[9] While perhaps a closer issue and not ultimately necessary to my decision, I do not think that Mr. Donohoe's conclusory analysis sufficiently establishes technological comparability either. By making the blanket suggestion that the Company A and Company B licenses are related to the '010 patent simply because they all relate generally to CDMA and GSM-GPRS technology, Mr. Donohoe does little more than allege a loose, vague technological comparability between different licenses. *See Laser Dynamics,* 694 F.3d at 79.

At oral argument, Defendant suggested that cases like *DataQuill* are inapposite because they involved plaintiffs using large patent portfolios to inflate the reasonable royalty rate, while Mr. Donohoe uses these licenses merely to provide a cap on what a reasonable royalty may be. (D.I. 245 at 65, 76). However, the relevant inquiry is one of comparability, and I see no reason why this standard should apply differently depending on whether a defendant or a plaintiff is relying on incomparable licenses.[10] Because Mr. Donohoe has failed to prove that the Company A and Company B licenses are comparable to the '010 patent and he has not adequately accounted for their differences, the portion of his reasonable royalty analysis relying on these licenses to set an appropriate upper limit must be excluded.[11] *See DataQuill*, 887 F. Supp. 2d at 1022.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant Defendant's Motion to Exclude the Testimony of Mr. Bluestein and Mr. Bero (D.I.168), and will grant Plaintiff's Motion to Exclude Opinions of Mr. Donohoe relating to a running royalty rate (D.I. 174). A separate order, consistent with this Memorandum Opinion, will be entered.

---

[10] Nonetheless, I have some hesitation in excluding Defendant's FRAND licenses argument. Plaintiff asserts a damages theory that bears no relation to reality, or even to a hypothetical reality. The result is that Plaintiff estimates a reasonable royalty of $1.75 per product, on the sale of accused products with a 2013 average sale price of $16 and estimated gross profits of $3 per product. (D.I. 201-6 at 28, 71). Plaintiff gets to this number without any reference to any actual license for anything. Actual licensing negotiations would likely consider actual licenses. I do not think it is a coincidence that the first two *Georgia-Pacific* factors are based on actual licensing history of the patent-in-suit and comparable licenses. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). And, to the extent a FRAND portfolio was shown to be more important economically and technologically, there is logic to the argument that it ought to set an upper bound in the hypothetical negotiation. However, the opinion presented here—supported only by the bald conclusion that a worldwide, standard-essential FRAND portfolio would intuitively be worth more than a single patent—lacks any meaningful comparison between the '010 patent and the FRAND portfolios at issue. Accordingly, I cannot conclude that Mr. Donohoe's opinion meets the economic comparability requirement. *See Worldtech*, 609 F.3d at 1320; *DataQuill*, 887 F. Supp. 2d at 1023.

[11] In any event, to the extent Defendant alleges that the core purpose of its motion is to counter the unreasonably high royalty estimate of Mr. Bero (D.I. 203 at 19; D.I. 254 at 1), that argument appears to be somewhat mooted by the exclusion of Mr. Bero's testimony.

18